MARGARET BRADFORD, administratrix,[1] vs. BAYSTATE
MEDICAL CENTER & others.[2]

Hampden. December 9, 1992. - May 11, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Supreme Judicial Court*, Further appellate review. *Appeals Court*, Further appellate review by the Supreme Judicial Court. *Negligence*, Medical malpractice, Doctor, Proximate cause. *Medical Malpractice*, Appeal, Tribunal. *Practice, Civil*, Appeal.

This court announced the rule, as to applications for further appellate review filed on and after the date of this decision, that it will not consider the arguments of a party who was wholly unsuccessful in the Appeals Court and who did not seek further appellate review, but appeared and requested that, as a part of this court's consideration of the case on further appellate review obtained by another unsuccessful party, it be granted more favorable treatment than it had received in the Appeals Court. [204-205]

In a medical malpractice case, the plaintiff's offer of proof to a medical malpractice tribunal made no evidentiary showing to support the plaintiff's claim that a defendant, a radiologist employed by defendant hospital, had failed to adhere to the standard of care and skill of the average member of the profession practicing the specialty of radiology in the manner of his communicating his findings to the surgeon who operated on the plaintiff's decedent and, consequently, the tribunal's determination that the plaintiff's offer of proof, if substantiated, was not sufficient to raise a legitimate question of liability appropriate for judicial inquiry was correct as to the radiologist and as to the hospital insofar as its liability could be based on the negligence of the radiologist. [206-207] O'CONNOR, J., concurring, with whom LYNCH, J., joined.

In a medical malpractice case, the plaintiff's offer of proof to a medical malpractice tribunal made a sufficient evidentiary showing to support the plaintiff's claim that a defendant, a vascular surgery consultant who examined the plaintiff's decedent, had failed to adhere to the standard

---

[1]Of the estate of Earl Bradford, and individually. We refer to a single plaintiff.

[2]Robert Austin and Kevin Martin.

of care and skill of an average vascular surgeon. [207] O'CONNOR, J., dissenting, with whom LYNCH, J., joined.

Statement of how medical malpractice tribunals may best deal with the question of causation, in the case of a patient allegedly deprived of a substantial, but less than even, chance of survival, until this question of law has been presented and resolved in an appellate decision. [208]

In a medical malpractice case, the medical malpractice tribunal erred in deciding that there was no basis on the evidence for proceeding against a vascular surgeon and the hospital for which he was employed insofar as its liability would be based on the surgeon's conduct, where the plaintiff produced sufficient evidence concerning causation to show that the alleged negligence of the surgeon was more probably than not a cause of the loss of a substantial chance by the plaintiff's decedent to survive. [209] O'CONNOR, J., dissenting, with whom LYNCH, J., joined.

CIVIL ACTION commenced in the Superior Court Department on June 15, 1989.

Motions to dismiss filed by the defendants Baystate Medical Center and Austin were heard by *John F. Moriarty*, J., and a motion to dismiss filed by the defendant Martin was heard by *Lawrence B. Urbano*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Michael L. Phelan, Jr.*, for the plaintiff.

*John G. Bagley* for Robert Austin.

*Michael H. Burke* for Baystate Medical Center.

*Gerard R. Laurence & Beth A. Bagley*, for Kevin Martin, submitted a brief.

*Thomas R. Kiley & Carl Valvo*, for Massachusetts Medical Society & others, amici curiae, submitted a brief.

WILKINS, J. Earl Bradford died on July 6, 1986, at Baystate Medical Center (Baystate) in Springfield after his mycotic (i.e., infected) aortic aneurysm ruptured. The plaintiff commenced this action alleging medical malpractice against Baystate, Robert Austin, Kevin Martin, and several other physicians.

A medical malpractice panel, convened pursuant to G. L. c. 231, § 60B (1990 ed.), concluded that the plaintiff's offer of proof, if substantiated, was not "sufficient to raise a legiti-

mate question of liability appropriate for judicial inquiry."
G. L. c. 231, § 60B. A judge dismissed the action as to all
defendants when the plaintiff did not file a bond as to any
defendant. The plaintiff appealed to the Appeals Court from
the judgments of dismissal entered as to Dr. Austin, Dr.
Martin, and Baystate. In an unpublished memorandum and
order, the Appeals Court vacated the judgments and the tri-
bunal's decisions and ordered that, as to these three defend-
ants, decisions be entered that the evidence, if substantiated,
was sufficient to raise a legitimate question for further judi-
cial inquiry. 32 Mass. App. Ct. 1117, 1117-1118 (1992). We
granted Dr. Austin's application for further appellate review.

Neither Baystate nor Dr. Martin applied for further appel-
late review. On our own we questioned whether we should
review the Appeals Court's conclusions as to them, and per-
mitted each to submit postargument comments on the issue.
Our order allowing Dr. Austin's application for further ap-
pellate review says nothing about what issues we would con-
sider. Our general rule is that we shall review all issues that
were before the Appeals Court (and not limit our review just
to those issues urged as grounds for further appellate re-
view), unless our order allowing further review indicates oth-
erwise. See *Commonwealth* v. *Souza*, 390 Mass. 813, 815
n.1 (1984); *Ballantine* v. *Falmouth*, 363 Mass. 760, 762 n.2
(1973). Those cases involved the right of a party who lost in
the Appeals Court and then applied successfully for further
appellate review to argue issues it pressed to the Appeals
Court but not in its application for further appellate review.
We said that such a party could do so. We have said, as to a
multiple party, multiple issue case, that a party successful in
the Appeals Court as to whom an application for further ap-
pellate review does not seek relief need not be concerned with
the proceedings before us involving other parties. See *Ford* v.
*Flaherty*, 364 Mass. 382, 386-387 (1973).[3]

---

[3]In such a situation the successful party may wish to request this court
that it so rule in any order allowing further appellate review.

We have not previously dealt with the question of the right of a party, who was entirely unsuccessful in the Appeals Court and who did not seek further appellate review, to appear and request that we grant it more favorable treatment than it received in the Appeals Court as a part of our consideration of the case on further appellate review obtained by another unsuccessful party. We adopt the rule, as to applications for further appellate review filed on and after the date of this opinion, that we will not consider the arguments of a wholly unsuccessful party who did not seek further appellate review. [4] In such a multiple party case, the party who is successful before the Appeals Court is entitled to know forthwith, on the allowance of an application for further review, what issues and parties are to be before this court. The question is a novel one and raised by this court on our own initiative. We have allowed the unopposed motions of Baystate and Dr. Martin to join in the proceeding on further appellate review.

The plaintiff's presentation to the malpractice tribunal offered the following general circumstances concerning Bradford's death. As a result of a meal that he had eaten in a Chicopee restaurant, Bradford contracted salmonella poisoning late in May, 1986. On May 29, he was admitted to Baystate with severe dehydration. After his June 6 discharge, Bradford was seen in Baystate's outpatient clinic. On July 2, Bradford was readmitted to Baystate. He had an abdominal aortic aneurysm which had been noted on June 30 as a result of an earlier test. On July 3, an abdominal ultrasound showed a "rather large" aortic aneurysm. On July 5, a CT scan showed an even larger aortic aneurysm. The plaintiff's expert, a gastroenterologist, indicated that accepted medical practice required prompt surgical intervention if an aneurysm of the size of Bradford's were expanding or leaking. At 12:30 A.M. on July 6, the aneurysm, infected with salmonella,

---

[4]The principle is consistent with our rule that one who does not appeal from a judgment is not entitled to more favorable treatment on appeal than that expressed in the judgment. See *Aetna Casualty & Sur. Co.* v. *Continental Casualty Co.*, 413 Mass. 730, 734 (1992).

ruptured, and Bradford had cardiac arrest. Attempts to save him by repair of the aneurysm failed, and Bradford died at 2:45 P.M.

Because a doctor-patient relationship was shown between Bradford and the two defendant physicians, the first question for the tribunal, applying the standard used in deciding a motion for a directed verdict, was whether there was evidence that each physician did not conform his conduct to accepted medical practice. See *Perez v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 413 Mass. 670, 676 (1992); *Blood v. Lea*, 403 Mass. 430, 433 (1988); *Kapp v. Ballantine*, 380 Mass. 186, 193 (1980). The second question, if there was evidence of negligence by a physician, was whether that negligence caused harm to Bradford. See *Perez v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, supra; *Blood v. Lea*, supra; *Kapp v. Ballantine*, supra. The liability of Baystate in this case solely depends on proof of its vicarious responsibility for the negligence of either or both physicians.[5]

We first consider whether there was evidence that Dr. Austin failed to adhere to the "standard of care and skill of the average member of the profession practising the specialty" of radiology. *Brune v. Belinkoff*, 354 Mass. 102, 109 (1968). On July 6, Dr. Austin made a report on a July 5 CT scan of Bradford's abdomen in which he noted a "large abdominal aortic aneurysm . . . approximately [nine centimeters] in diameter," compared to a diameter of about six centimeters "on the most recent ultrasound." He stated his impression that the aneurysm could be leaking. We do not know when Dr. Austin first read the CT scan nor what his

---

[5]Liability of Baystate (and any doctor) cannot be based on generalities in the reports of the plaintiff's expert, such as statements that: certain facts "should have set off a lot of red flags for both the surgeon and the radiologist in this academic teaching facility"; Bradford's death "could have been prevented with appropriate state-of-the-art care known to be present at [Baystate]"; "the medical care that was rendered on July 5, 1986, was less than acceptable and not up to the standards expected of such a sophisticated referral center"; and "[c]learly the patient's management was not appropriate and the hospital has some responsibility for this whether it be due to poor judgment from the radiologist or the surgeon."

professional duty was to read the CT scan at any time prior to the rupture of Bradford's aneurysm. There is no evidence that Dr. Austin misread the CT scan on July 5, or that in some way he misled Dr. Martin, the vascular surgeon.

Nowhere in his reports does the plaintiff's expert state that Dr. Austin failed to adhere to accepted medical practice. The general statement that better communication "as to the pertinent medical details may have resulted in the emergency surgery which was required" does not satisfy the directed verdict standard applicable in cases of this sort. The medical malpractice tribunal's determination was correct as to Dr. Austin and as to Baystate insofar as its liability could be based on the negligence of Dr. Austin.

As to Dr. Martin, who, as a vascular surgery consultant, saw the patient on July 5, the record provides evidence that would warrant the conclusion that he failed to adhere to the standard of care and skill of an average vascular surgeon. Dr. Martin was aware of the aneurysm on July 5. The hospital record indicates that by July 5 the aneurysm had enlarged. Although the patient had complained of back pain, Dr. Martin's consultation note states that there was no back pain consistent with expansion or leaking of the aneurysm and that there was no evidence of a leak on the CT scan. Dr. Austin, however, stated his impression that the aneurysm could be leaking. The plaintiff's expert stated that emergency surgery should have been performed on July 5 to correct the aneurysm, based on its size, its steady expansion, and possible leakage. This evidence was sufficient to meet the directed verdict standard on the issue of Dr. Martin's negligence.[6]

---

[6]The gastroenterologist stated that, "[i]f an expanding or leaking aneurysm had been documented, the patient should have been scheduled for surgery [the] evening [of July 5]." This is an opinion on the course of action that one reasonably exercising the care and skill of an average vascular surgeon should have followed. We must read the record in the light most favorable to the plaintiff because we apply a directed verdict standard. See *Little* v. *Rosenthal*, 376 Mass. 573, 578 (1978). At the least, the record read favorably to the plaintiff shows that an expanding aneurysm had been documented in the hospital record and that Dr. Martin should have scheduled the patient for surgery on July 5.

There remains the question whether the plaintiff met the directed verdict standard concerning causation, by showing an adequate causal relationship between Dr. Martin's alleged negligence and any harm Bradford sustained. This issue is complicated by the opinion of the plaintiff's expert that, if surgery had been scheduled the evening before the aorta ruptured, the patient "might have survived." Once the aorta ruptured, "any chance for survival was removed." A mycotic aneurysm has a high mortality rate, "estimated to be 50-60%."[7] "Thus, [Bradford] may very well have died even if he had had surgery that evening prior to the rupture. His only chance would have been for emergency surgery at the latest on July 5."

The traditional rule of tort law is that a plaintiff must show that it is more probable than not that the injury was caused by the defendant's negligence. See *Forlano* v. *Hughes*, 393 Mass. 502, 507-508 (1984). If one were to apply that rule strictly in this case, the plaintiff's evidence has not passed the test. Bradford's chances of survival were no greater than even because of his mycotic aneurysm. At least as likely as not, therefore, Bradford would have died anyway due to the aneurysm. On the other hand, there is reason to question a rule of law that would totally exonerate a negligent physician from tort liability when the patient had a fair, but less than even, chance of survival if the physician had not been negligent. This question of law was not for the tribunal to decide and is one on which this court has not taken a position. No party has made any appellate argument on the point, and it does not appear that the medical malpractice tribunal considered it.[8]

---

[7]The expert did not explicitly separate out the chances of persons with mycotic aneurysms who have surgery and those that do not. The inference is that only if an operation were performed did Bradford have even a 40%-50% chance of survival.

[8]Cases on this issue are collected in 1 American Law of Medical Malpractice 2d § 5.3, at 239 (1992), where it is said that "[t]here appears to be a difference of opinion among courts in distinguishing between a 'loss of chance' and a 'better than 50/50 chance' concept." See King, Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Con-

Until the question of law is resolved, medical malpractice tribunals can best deal with this causation question by deciding whether or not the alleged negligence of a defendant was more probably than not a cause of the loss of a substantial chance to survive. The plaintiff's evidence met that causation standard. Accordingly the medical malpractice tribunal erred in deciding that there was no basis on the evidence for proceeding against Dr. Martin (and Baystate insofar as its liability would be based on Dr. Martin's conduct).

The judgment of dismissal is affirmed with respect to Dr. Austin. The judgment of dismissal, the order for a bond, and the findings and decision of the medical malpractice tribunal are vacated as to Dr. Martin and Baystate Medical Center. A finding and decision shall be entered that the plaintiff's offer of proof, if properly substantiated, is sufficient to raise a legitimate question of liability for further judicial inquiry as to Dr. Martin and, based on Dr. Martin's alleged negligence, as to Baystate Medical Center.[9]

*So ordered.*

O'CONNOR, J. (concurring in part and dissenting in part, with whom Lynch, J., joins). I agree that the judgment of dismissal with respect to Dr. Austin ought to be affirmed.

---

ditions and Future Consequences, 90 Yale L.J. 1353 (1981); Note, Causation in Medical Malpractice: A Modified Valuation Approach, 50 Ohio St. L.J. 469 (1989).

[9]We do not decide nonjurisdictional issues raised solely in a brief presented by an amicus curiae, particularly where the brief was not presented to the Appeals Court. Nor do we decide a new issue (urging greater deference to the tribunal) raised for the first time by a party in a supplemental brief filed after that party's application for further review has been allowed. We add, however, that it may be too late to persuade this court to abandon the directed verdict standard that we have applied since the medical malpractice tribunal system was adopted. See *Little* v. *Rosenthal*, 376 Mass. 573, 578 (1978). Nor would we be inclined to change our practice and permit review of a tribunal's decision favorable to a provider of health care only after a bond had been filed and the case tried. See *McMahon* v. *Glixman*, 379 Mass. 60, 63-64 (1979).

However, I do not agree that the judgment of dismissal, the order for a bond, and the decision of the medical malpractice tribunal should be vacated as to Dr. Martin and Baystate Medical Center. Under a directed verdict standard, the plaintiff's offer of proof before the tribunal was insufficient to raise a legitimate question either as to whether Dr. Martin's conduct failed to conform to acceptable medical practice or as to whether any fault on his part caused the patient's injury and death.

No evidence was offered that would show that Dr. Martin failed to adhere to the "standard of care and skill of the average member of the profession practising the specialty" of vascular surgery. *Brune* v. *Belinkoff*, 354 Mass. 102, 109 (1968). The offer of proof consisted almost entirely of hospital records and two letters, which were based on those records, written by Dr. David M. Saltzberg, a gastroenterologist and assistant professor of medicine at University of Maryland Hospital. As a practical matter, whether the plaintiff's offer of proof was sufficient depends on the content of the letters written by Dr. Saltzberg, the plaintiff's expert.

The first letter, dated January 16, 1987, stated in relevant part the following. On July 3, 1986, a sonogram of Earl Bradford's (patient) abdomen was obtained. "This confirmed the presence of the abdominal aortic aneurysm which was noted to be 6.3 cm by 5.8 cm by 5.7 cm, which is rather large. . . . A CT scan was obtained on July 5, 1986, to rule out the possibility of abdominal abscess. The CT scan report describes an aneurysm that had expanded to 9 cm in diameter and which may be leaking as evidenced by increased fluid density tracking around the left kidney. The Radiologist describes the aneurysm to be unmistakably enlarging compared to the sonogram of July 3, 1986. However, there is some confusion as to the accuracy of this report as it was dictated after the patient's demise. To confuse the issue further, a vascular surgeon [Dr. Martin] who saw the patient on the same day of the CT scan, (July 5, 1986) claims that the CT scan shows no evidence of leak and that the patient had no

back or abdominal pain.[1] He suggested elective resection of the aneurysm after the patient's other problems had been sorted out. He also wanted to see previous abdominal x-rays to decide whether the aneurysm was enlarging. It's not clear whether the surgeon actually knew of the sonographic and/or CT scan report, or if the radiologist failed to contact the surgeon."

Dr. Saltzberg's January 16, 1987, letter continues, noting among other things that the patient suffered cardiac arrest at 12:30 A.M., July 6, and died the same day at 2:00 P.M. Dr. Saltzberg observed that "[s]everal questions are raised by this case," and, in answer to the first question he concluded that "the rupture of aorta was clearly due to Salmonella infection." He answered a second question by stating his belief that the initial treatment of the patient was appropriate. "The third and fourth questions," he said, "relate to [the patient's] terminal admission. Was he appropriately managed? Could his life have been saved? I think in retrospect his symptoms necessitating admission were related to expansion of the aneurysm. By the 3rd of July, the physicians knew he had a rather large aneurysm with Salmonella still in his system along with low grade fevers. These signs should have raised the question of an infected aneurysm but did not necessarily warrant emergency surgery. The interpretation of the CT scan, however, which was obtained on [July] 5th is crucial to understanding his management. At the very least there was a lot of confusion. The CT scan report dictated following the patient's demise described a rapidly enlarging and leaking aneurysm. On the other hand, the vascular surgeon claims there was no evidence of leak. Did the radiologist initially misread the film and mislead the surgeon (and then after the patient's death amend the report)? Or, did the surgeon actually not speak with the radiologist or did he not closely scrutinize the CT scan? I'm not sure which is true,

---

[1]Dr. Martin's entry in the patient's hospital progress notes says in relevant part, "No back pain/flank pain that would be C/W [consistent with] AAA [abdominal aortic aneurysm] expansion leak & no evidence of leak on CT."

but if the aneurysm was clearly identified as rapidly expanding, the patient should have had emergency surgery that evening, or at the very least be considered for the next morning. Neither of these options was considered. . . . Clearly the patient's management was not appropriate and the hospital has some responsibility for this whether it be due to poor judgment from the radiologist or the surgeon. Once the patient arrested, his probability for survival was minimal. . . .

"Could this patient have been saved? [The patient] had a mycotic aneurysm, which has a high mortality rate, estimated to be 50-60%. This was unknown pre-operatively. Thus, the patient may very well have died even if he had surgery that evening prior to the rupture. His only chance would have been for emergency surgery at the latest on July 5, 1986, but preferably after the sonogram on July 3, 1986. His physicians did not provide him with that opportunity due [to] their misjudgment and/or lack of attention to the critical details of [the patient's] case. Standard practice in the community dictated urgent surgical intervention for rapidly expanding aneurysm regardless of etiology. There was therefore, in my professional opinion significant errors in judgment likely constituting medical malpractice."

Dr. Saltzberg wrote a second letter, dated August 14, 1990, which was part of the plaintiff's offer of proof before the tribunal. I shall refer to the portions of that letter that are of particular significance to the case against Dr. Martin. The letter mentions the ultrasound (i.e., sonogram) performed on July 3, 1986, and its disclosure of "a large aortic aneurysm of 6.3 x 5.8 x 5.7 cm." The letter states, "Although an aneurysm of this size should be repaired surgically it is not necessary to do emergency surgery unless it is believed that the aneurysm is leaking or rapidly expanding."

The August 14, 1990, letter also states: "An abdominal CAT scan was performed on July 5. A large aneurysm that was 8 x 9 cm was identified on the CAT scan. Dr. Kevin Martin of Vascular Surgery evaluated the patient on the late afternoon of [July] 5th. He reviewed the CAT scan and noted the aneurysm but stated in a note that there was no

evidence of leakage. He considered the possibility of an enlarging aneurysm but felt that the lack of pain by the patient and the absence of leakage on the CAT scan made it unlikely that the aneurysm was expanding, although the patient had persistently complained of back pain [see note 1, *supra*; Dr. Martin noted no back pain *consistent with leaking of the aneurysm*]. He did attempt to retrieve earlier x-rays to see if he could determine how quickly the aneurysm might be growing and indicated that the aneurysm did need to be repaired, but that this could be done electively.

"During the early morning hours of July 6, the aneurysm ruptured. The patient was immediately taken to the Operating Room and was found to have a grossly purulent aorta. At this point there was really nothing that could be done to save the patient, and he expired later in the day. The official abdominal CAT scan report dictated on July 6 indicated that the patient had an expanding leaking aortic aneurysm."[2]

Dr. Saltzberg's second letter further stated: "It is apparent that there were problems with the medical care received by [the patient] on July 5. Dr. Martin quotes the aneurysm as

---

[2]The final CT scan report does not indicate that there was a large expanding leaking aneurysm. Dr. Austin's report in relevant part is as follows:

"1. Given the large size of the aorta, the possibilities include leaking along the renal pedicle into the perinephric space with the collection around the kidney representing chronically accumulating blood. The other *possibility* includes *leaking of the aorta or perhaps* compression by the aorta accounting for dilatation of the left collecting system with a density around the kidney being related to extravasated urine.

"2. Large aortic aneurysm with changes as described above. Clearly *leak of the aneurysm must be considered particularly in light of changes around the left kidney* and *increase in size since the prior ultrasound* examination as well as position of intimal calcification." (Emphasis added.)

The following addendum, entered July 14, 1986, appears at the end of the report:

"ADDENDUM: This addendum is to say that the C.T. report was dictated on the day following the C.T. Scan at which point the paperwork necessary for the dictation was available. The report was dictated following and with the knowledge of the patient's course over the hours subsequent to the C.T. Scan.

"/s/ Robert Austin M.D."

being 9 x 8 cm, which is much larger than that seen on the ultrasound of two days earlier. He further stated that there was no evidence of leakage from the aneurysm. Yet, the final CAT scan report indicated that there was a large expanding leaking aneurysm [see note 2, *supra*]. Dr. Austin, who interpreted the ultrasound two days previously, was the radiologist who read the abdominal CAT scan. If an expanding or leaking aneurysm had been documented, the patient should have been scheduled for surgery that evening. If the patient had been taken immediately to the Operating Room, he might have survived. By waiting until the aorta ruptured to operate, any chance for survival was removed. . . . Clearly, on the 5th of July there was confusion and/or misunderstanding as to the pertinent medical facts, which may have contributed to [the patient's] demise by delaying surgery. Did Dr. Austin misinterpret the CAT scan on July 5 and give Dr. Martin misinformation only to correct his reading on July 6? Did Dr. Martin actually review the CAT scan in depth with Dr. Austin? Why was the CAT scan not compared to the ultrasound of July 3? Was Dr. Martin aware of the July 3 ultrasound and, if so, why did he delay therapy for an expanding aneurysm?"

The expert's letters ask many questions. The letters supply very few answers. For example, there is no evidence that, had he exercised the care and skill of an average vascular surgeon in all the circumstances present between late afternoon on July 5, and the rupture of the aneurysm, Dr. Martin would have known prior to the rupture that the aneurysm was rapidly expanding. Also, although Dr. Austin's report concerning the July 5 CT scan described an aneurysm that had expanded and could have been leaking, the report was dictated long after the rupture had occurred. There is no evidence that Dr. Austin was accessible to Dr. Martin between the late afternoon of July 5 and the aneurysm's rupture, and there is no evidence that, in concluding that the CT scan failed to reveal evidence that the aneurysm was leaking, Dr. Martin failed to meet the standard of care and skill of the average vascular surgeon. *Brune* v. *Belinkoff*, 354 Mass. 102,

109 (1968). Likewise, there is no evidence either that Dr. Martin was wrong when he concluded that the patient had no back pain *consistent with an abdominal aortic aneurysm leak*, or that, if he was wrong as to that, Dr. Martin failed to meet the requisite standard of care and skill in reaching that conclusion.

The expert's letters do not even allude to the standard of care and skill of the average vascular surgeon. The letters demonstrate no attempt to measure Dr. Martin's conduct by such a standard, and surely, apart from those letters, nothing in the record, under a directed verdict standard, shows negligence (malpractice) on the part of Dr. Martin. The court states, *ante* at n.6, that "[t]he gastroenterologist stated [in his letter dated August 14, 1990] that '[i]f an expanding or leaking aneurysm had been documented, the patient should have been scheduled for surgery [the] evening [of July 5].' This is an opinion on the course of action that one reasonably exercising the care and skill of an average vascular surgeon should have followed." As the hospital record indicates and Dr. Saltzberg's letter dated January 16, 1987, confirms, the final report relative to the CAT scan done on July 5, 1986, was not even dictated by Dr. Austin, the radiologist, until after the patient's demise and, as I have stated in note 2, *supra*, the report when dictated did not say that there was an expanding, leaking aneurysm. Most importantly, there is no expert opinion in the record that an expanding or leaking aneurysm should have been documented before it was documented, or that Dr. Martin, rather that Dr. Austin, the radiologist, should have documented it and then scheduled the patient for surgery on the evening of July 5. The gastroenterologist's observation that, if an expanding or leaking aneurysm had been documented sooner, the patient should have been scheduled for surgery, does not come close to constituting an expert's opinion that "one reasonably exercising the care and skill of an average vascular surgeon" would have done anything that, according to the record, Dr. Martin failed to do, or would have refrained from doing anything that Dr. Martin did. For that reason alone, the claim against

Dr. Martin, as well as the claim against Baystate Medical Center based on Dr. Martin's negligence, were properly dismissed. The plaintiff does not argue that, even if she failed to raise a legitimate question of liability as to Drs. Austin and Martin, which, in my view, she failed to do, she nevertheless succeeded in raising such a question with respect to Baystate.

I would affirm the judgment below solely on the ground that no legitimate question of malpractice was demonstrated before the medical malpractice tribunal. I speak briefly, however, to the causation question. The court observes that "[t]he traditional rule of tort law is that a plaintiff must show that it is more probable than not that the injury was caused by the defendant's negligence. See *Forlano* v. *Hughes*, 393 Mass. 502, 507-508 (1984). If one were to apply that rule strictly in this case, the plaintiff's evidence has not passed the test." *Ante* at 208. The court then goes on to say, *ante* at 208, that "there is reason to question [such] a rule of law" in a case like the present one and that, until the court resolves the question, medical malpractice tribunals should conclude as to the causation factor that a legitimate question of liability has been shown where there is evidence that a defendant's malpractice resulted in the patient's "loss of a substantial chance to survive." *Ante* at 209. If such a rule were to be adopted, the causation necessary to liability might be shown by an offer of proof that leaves to speculation the question whether the asserted malpractice probably resulted in the injury or death complained of, and indeed might be shown by an offer of proof that affirmatively demonstrates, as it does in this case, that the injury or death probably would have occurred without malpractice. It is my view that, unless and until such a radical departure from traditional tort law is adopted in this Commonwealth, a course that should not be followed, the responsibility of a medical malpractice tribunal is to determine whether the plaintiff's offer of proof, if substantiated, is "sufficient [in the light of current tort law] to raise a legitimate question of liability appropriate for judicial inquiry." G. L. c. 231, § 60B (1990 ed.). In this case, if there had been evidence of

negligence, a determination by the tribunal that a legitimate question of liability had been raised despite lack of proof of probable causation would have violated the tribunal's statutory mandate. Therefore, I would affirm the judgment below because the plaintiff's offer of proof to the tribunal was insufficient both as to negligence and causation. The bond was properly ordered, and the dismissal of the case in response to the plaintiff's failure to file a bond was correct.