CHRISTOPHER J. RAHILLY, administrator,[1] vs. NORTH ADAMS REGIONAL HOSPITAL & others.[2]

No. 92-P-1583.

Hampden. February 18, 1994. - June 28, 1994.

Present: DREBEN, KAPLAN, & GILLERMAN, JJ.

*Medical Malpractice*, Appeal, Tribunal, Expert opinion. *Negligence*, Medical malpractice, Doctor, Nurse, Medical technician, Helicopter, Hospital. *Practice, Civil*, Appeal. *Evidence*, Expert opinion. *Witness*, Expert.

A plaintiff's offer of proof before a medical malpractice tribunal was sufficient to raise a legitimate question of liability appropriate for judicial inquiry, without the necessity of posting a bond, with respect to the minor patient's treating pediatrician, the physician and nurse in attendance during helicopter transport of the child, and two treating doctors at the medical center to which the child was transferred. [717-721, 721-723] GILLERMAN, J., dissenting.

A plaintiff's offer of proof before a medical malpractice tribunal was not sufficient to raise a legitimate question of liability appropriate for judicial inquiry with respect to certain nursing staff at a hospital, where no nurse-patient relationship was demonstrated. [721]

A helicopter ambulance service corporation was not a "provider of health care" within the meaning of G. L. c. 231, § 60B; a claim against it in a medical malpractice action was incorrectly considered by the malpractice tribunal that heard the case. [721]

CIVIL ACTION commenced in the Superior Court Department on December 19, 1990.

The case was heard by *Constance M. Sweeney*, J., on a motion to dismiss.

[1] Of the estate of Jeremy Rahilly.

[2] Diane Gagne, Marianne Bastian, Jane Soucie, and Harold Kline, nurses at North Adams Regional Hospital; Donna Rayner, a respiratory therapist at North Adams Regional Hospital; Michael Sussman, a physician at North Adams Regional Hospital; New England Life Flights, Inc.; Gail LaPlante, a nurse, and Daniel Muse, a physician, employed by New England Life Flights; Baystate Medical Center, Inc.; and Stephen Lieberman and Paul Marz, physicians at Baystate Medical Center.

*William K. Danaher, Jr., & Edward J. Spence, III*, for the plaintiff.

*John A. Agostini* for Diane Gagne & others.

*Paul R. Greenberg* for Daniel Muse & others.

*Michael J. Powers* for Paul Marz.

*Kathleen E. Sheehan* for Stephen Lieberman.

*Mary J. Kennedy* for Baystate Medical Center.

*Nancy A. Lyon* for Michael Sussman, submitted a brief.

DREBEN, J. Five month old Jeremy Rahilly died at the Baystate Medical Center (Baystate) in Springfield on August 10, 1988. There was a question whether the child had been abused — the medical examiner's opinion was that "the manner of death was homicide." Jeremy's father was charged with murder. He was acquitted, and thereafter brought this action, as administrator of Jeremy's estate, alleging medical malpractice against North Adams Regional Hospital (North Adams), Baystate, numerous physicians, nurses, a respiratory therapist, and New England Life Flights, Inc. His offer of proof included, among other materials, grand jury testimony and testimony from his criminal trial. A medical malpractice panel, convened pursuant to G. L. c. 231, § 60B, concluded that the plaintiff's offer of proof, if substantiated, while sufficient as to some of the defendants, was not "sufficient to raise a legitimate question of liability appropriate for judicial inquiry" as to others. Judgments of dismissal entered as to the latter defendants, the plaintiff having failed to file a bond. The plaintiff's appeal from those dismissals raises the question of the sufficiency of his offer of proof. We affirm the judgments of dismissal against some of the defendants but reverse as to others.

We take our facts from the materials in the plaintiff's offer of proof. At about 11:30 P.M. on August 5, 1988, the plaintiff saw that his son Jeremy was having difficulty breathing while sleeping in his crib. When he lifted his son out of the crib, the breathing stopped. He called the North Adams police department and began artificial respiration. The police arrived within five minutes, by which time the child had resumed

very slow breathing, but the ambulance, which the police had called, was unable to find the plaintiff's house and did not arrive for about one-half hour. The child was driven to the North Adams Regional Hospital. On arrival, he was "limp and pale, breathing at the rate of four respirations a minute" (a very slow rate), and could not focus his eyes. An attempt to intubate Jeremy was unsuccessful, the endotracheal tube was inserted into his esophagus rather than the trachea, and air was administered to his stomach rather than to his lungs.[3]

Dr. Michael Sussman, Jeremy's pediatrician, arrived at the hospital at about 12:50 A.M., and assumed responsibility for his care. He examined the child, spoke to the father, and ordered Jeremy transferred by helicopter via New England Life Flights to Baystate, which had a pediatric intensive care unit. The discharge diagnosis at North Adams included: "Respiratory Arrest. . . . Possible hypoxic cerebral injury."

The child arrived at Baystate "marginally responsive" at 3:24 A.M. A second-year resident in pediatrics, Dr. Paul Marz, after discussions with the director of the pediatric intensive care unit, Dr. Stephen Lieberman, performed a lumbar puncture. The puncture showed bleeding, and Dr. Marz ordered a CT scan.

No CT scan had been performed at North Adams and none was performed at Baystate until 8 A.M. on August 6, more than four and one-half hours after the child's arrival at Baystate. The 8 A.M. CT scan showed intracranial bleeding[4] as well as findings "consistent with generalized anoxia" (lack of oxygen). The scan showed no evidence of increased intracranial pressure. The child died at Baystate on August 10. Baystate's records state the final diagnosis as: "Anoxic brain damage. Intracranial Hemorrhage. Aspiration Pneumonia." That record also states that the child was "found to have a significant intracranial bleed along with anoxic brain damages, verified by CT scan."

---

[3]The offer of proof against the physician who attempted the intubation was deemed sufficient by the tribunal.

[4]The CT scan reported "acute blood seen layering in the posterior horns of the lateral ventricles bilaterally."

The plaintiff's offer of proof rested in large part on a letter
of Dr. Robert Buscho, a physician who had a specialty,
among others, of emergency medicine. The offer also in-
cluded, in addition to grand jury and trial testimony from the
father's trial, the report of Dr. Richard Otis, an anatomic
pathologist, records of the hospitals, and of New England
Life Flights, the helicopter transport service.

Dr. Buscho's report, insofar as it relates to the defendants
in this appeal, is set forth as an Appendix to this opinion. He
was provided with most of the medical records. His introduc-
tory discussion, prior to delineating the negligence of specific
individuals, states: "It is my opinion that a number of indi-
viduals who treated Jeremy Rahilly failed to meet accepted
medical standards and contributed to his eventual injury and
death. Furthermore, there are many elements of medical
negligence in this case. I have divided this letter into sepa-
rate sections in order to more clearly delineate those individ-
uals and entities whose care fell below the standard of care."

In reviewing the offers of proof found insufficient by the
tribunal, we will follow the order of Dr. Buscho's letter. The
standard we must adopt is "comparable to that applied to a
defendant's motion for a directed verdict, and appraisal of
the weight and credibility of the evidence is impermissible."
*Gugino* v. *Harvard Community Health Plan*, 380 Mass. 464,
468 (1980). Thus, the evidence must be viewed in the light
most favorable to the plaintiff.

1. *Sufficiency of the offer of proof as to Dr. Sussman.* "To
succeed against a physician, the plaintiff's offer of proof must
show that: (1) a doctor-patient relationship existed; (2) the
doctor did not conform to accepted medical standards in per-
forming his duties with regard to the patient; and (3) dam-
age resulted from this failure to conform. *Kapp* v. *Ballantine*,
380 Mass. 186, 193 (1980)." *Perez* v. *Bay State Ambulance
& Hosp. Rental Serv., Inc.*, 413 Mass. 670, 676 (1992).
Since a doctor-patient relationship was shown between Jer-
emy and Dr. Sussman, we turn to the remaining two require-
ments. Dr. Buscho opined first that Dr. Sussman deviated
from the "standard of care" by failing to perform and docu-

ment a complete history and medical examination of the child. Had he done so, "it is possible [he] would have found the scalp contusion[5] indicating that the child had a head injury"; had that been appreciated, "it would have led the physicians to perform a CT scan"; the scan would have "shown the intracranial bleed and changed the entire therapeutic care for this baby." There were, in Dr. Buscho's opinion, strong indications to perform an emergency CT scan at North Adams. "Not only was there clinical evidence of a head injury that was not appreciated, but also in any unconscious and unresponsive child, a CT scan should be performed to rule out a number of intracranial conditions."

The foregoing discussion stating that a CT scan should have been performed is an opinion as to the course of action that a physician reasonably exercising the care and skill of an average pediatrician should have followed. See *Bradford v. Baystate Med. Center*, 415 Mass. 202, 207 n.6 (1993).[6] This evidence was sufficient to meet the directed verdict standard on the issue of Dr. Sussman's negligence.

Dr. Buscho explained the significance of the failure to perform the scan. Hypoxia and intracranial bleeding each cause intracranial pressure. "A CT scan would have given this di-

---

[5]The autopsy report in the portion entitled "Evidence of Injury" lists the following injuries:

"There are two adjacent superficial brown zones in the midline of the forehead. The largest measures 5/16 x ⅛ inch . . . The second is ⅛ inch in diameter nearly round lesion just below this also in the midline of the forehead. There is a ¾ inch long red line of congestion in the skin within the hair-bearing area above the left ear . . . The occipital scalp somewhat to the right of the midline shows a faint contused [bruised] zone measuring about 1½ x 2 inches, . . . When the scalp is reflected a ⅝ inch diameter zone of hemorrhage into the soft tissues in the subgaleal regions only is seen. This is located over the left half of the occipital bone . . . ."

[6]To require, as suggested in note 2 of the dissent, that a plaintiff's expert must state his opinion in formulaic terms, i.e., "fell below the standard of care" of the specialty involved, ignores the majority opinion of *Bradford*, as expressed in n.6 at 415 Mass. 207, ignores also the standard by which the record is to be read, i.e., most favorably to the plaintiff, and, by limiting experts to procrustean pat phrases, may also undercut the value of such opinions to the medical malpractice tribunal.

agnosis, and treatments would have then been undertaken to lower the intracranial pressure."

Dr. Sussman's contention, adopted by the dissent, stresses that the first CT scan which was taken at 8 A.M. on August 6 at Baystate does not show increased intracranial pressure. From that fact, Dr. Sussman (and the dissent) argue that the factual assumptions essential to Dr. Buscho's opinion are not supported by the plaintiff's offer of proof. This is too grudging a reading of Dr. Buscho's letter. A reasonable "meaning" of Dr. Buscho's letter, open to a jury, see *Kopycinski* v. *Aserkoff*, 410 Mass. 410, 418 (1991), is that, had the hypoxia and intracranial bleeding, which were both shown on the CT scan, been diagnosed by Dr. Sussman, the "entire therapeutic care" would have been "changed" — intracranial pressure would have been anticipated and treated preventively.

Testimony at the father's trial[7] as well as Dr. Otis's opinion letter on the cause of the baby's death[8] support the conclusion that hypoxia (shortage of oxygen) and anoxia (the complete absence of oxygen) lead to swelling (edema), i.e., intracranial pressure, thus reinforcing the need for early diagnosis and treatment.

---

[7]Dr. Karen Burke, the physician who had attempted the endotracheal intubation, was questioned as follows at trial:

Q. "Do I understand that what you're saying is that when the brain has experienced some kind of damage from either anoxia or a severe hypoxic episode, is that there are now processes ongoing that are changing the brain?"

A. "Yes."

Q. "And one of those processes that is going on is cerebral edema?"

A. "Yes."

Q. "And cerebral edema is swelling of the brain; is that right?"

A. "Yes."

[8]Dr. Otis indicated that in his view the cause of death which accounted for the massive brain swelling (cerebral edema) was severe hypoxic ischemic injury with edema and encephalomacia.

"It is my opinion as an anatomic pathologist that Jeremy Rahilly died as a direct result of massive anoxic brain damage. . . . Events described by Dr. Buscho in his letter are totally consistent with the findings on autopsy of severe anoxic brain injury and I am in basic agreement with his identification of events which caused the massive anoxic brain damage."

Dr. Buscho's opinion, buttressed by that of Dr. Otis, was that the failure to recognize and aggressively treat the intracranial pressure "contributed to Jeremy's brain damage." Fairly read, this evidence, when coupled with his statement that "in the evolution of the care of this infant, it is my opinion that there are many areas of negligence which eventually led to the child's brain death" (see Appendix, *infra* at 724) was sufficient to meet the causation standard set forth in *Bradford* v. *Baystate Med. Center*, 415 Mass. at 208-209.

Dr. Buscho also considered Dr. Sussman's decision to transfer the critically ill child, before he was stabilized and without accompanying medical records, "below the standard of care."[9] Although Dr. Sussman argues there is no evidence to support the claim that the medical records were not transported to Baystate with the child, the offer of proof supports the inference that the records were not sent. Dr. Lieberman's testimony before the grand jury, reproduced in the margin, reveals the limited information that he had, strongly suggesting that he did not have the medical records of North Adams.[10] Another reasonable inference from Dr. Lieberman's testimony is that the absence of the records led to the lumbar puncture to rule out infection, and contributed to the

---

[9]Dr. Burke's testimony at the father's criminal trial indicated that "in a general way" it was Dr. Sussman's responsibility to make sure that the records went with the baby.

[10]Q. "You had the information from North Adams Regional Hospital as to how the baby was brought into the hospital and the reason for it; that it had been choking, that perhaps it had gotten some food caught in its windpipe or something along those lines?"

A. "That was about all I knew. They had a team that had come out from the University of Massachusetts in a helicopter and picked the baby up, communicated very briefly with Dr. Marz; and the communication consisted just of about that and nothing else really. The baby had choked and had apparently swallowed some of the formula and that was really about the extent of it."

Q. "Based on that limited information and your observations of the CAT scan, regarding the oxygen starved nature of the brain, was the history consistent with what you saw in the CAT scan?"

A. "No . . . The CAT scan indicated a much greater insult in terms of deprivation of oxygen . . . than what was described to Dr. Marz."

As indicated in the text, the discharge diagnosis in the North Adams records listed "possible hypoxic cerebral injury."

further delay in performing the CT scan and preventive treatment.

2. *Sufficiency of the offer of proof as to nursing staff and respiratory therapist at North Adams Regional Hospital.* Dr. Buscho's letter faults the nursing staff for taking only one set of complete vital signs in the course of two and one-half hours for this critically ill child. The offer of proof does not indicate whether any of the five named North Adams staff persons were present and participated in the care and treatment of the child, i.e., the offer of proof does not, as required, establish that a nurse-patient relationship existed, nor does it appear that the obligation to take more frequent vital signs for Jeremy was a duty to be undertaken independently by anyone on the nursing staff without orders from a physician. For these reasons, the judgment of dismissal is affirmed with respect to the nonphysician defendants on the staff of North Adams.

3. *Sufficiency of the offer of proof as to New England Life Flights, Inc., and the physician and the nurse aboard the helicopter.* New England Life Flights, Inc., the company providing helicopter service, is not within the definition of a health care provider under G. L. c. 231, § 60B, for the reasons set forth in *Perez* v. *Bay State Ambulance & Hosp. Rental Serv., Inc.,* 413 Mass. at 675-676. The claim against it is not, therefore, one to be considered by the tribunal.

The doctor and the nurse, however, are within the statute. As discussed earlier, Dr. Lieberman's testimony reasonably raises the inference that the hospital records were not sent with the child. Such an omission was below the standard of care in Dr. Buscho's opinion. Our discussion concerning Dr. Sussman's failure to send the records also applies to Dr. Muse and nurse LaPlante who transported Jeremy in the helicopter. Accordingly, the offer of proof was sufficient as to these two individuals.

4. *Sufficiency of the offer of proof as to Dr. Marz, Dr. Lieberman, and Baystate.* Dr. Buscho faulted Dr. Marz and Dr. Lieberman in two respects: for performing a lumbar puncture prior to making certain (by means of a CT scan)

that the child did not have increased intracranial pressure, and for not procuring immediately a CT scan once the lumbar puncture showed blood.

We need not discuss the inappropriateness of the lumbar puncture, as Dr. Buscho's opinion as to the delay in taking the CT scan is sufficient as an offer of proof that the procedures followed by the physicians did not conform to accepted medical standards. Under *Kapp* v. *Ballantine*, 380 Mass. at 192 (1980), the tribunal's function is limited to the ascertainment whether the offer of proof is sufficient as to any one of the theories of recovery.

Once the lumbar puncture showed intracranial bleeding, Dr. Buscho stated there was a neurologic emergency and the CT scan should have been done immediately, not several hours later. The delay contributed to the brain injury in that it delayed institution of measures to lower pressure. Although the offer with respect to Drs. Marz and Lieberman is more marginal, for substantially the same reasons that we held the offer of proof sufficient as to Dr. Sussman, we consider the offer of proof adequate as to these two doctors. As with Dr. Marz, we need not consider the other claims against Dr. Lieberman. See *ibid.*

A few final comments are in order. The reader will observe that the majority and the dissent have a different view of the medical records. The majority, as the foregoing discussion indicates, considers that there is factual support in the medical records upon which Dr. Buscho was entitled to rely in forming his opinion. The dissent does not find such factual support. Dr. Buscho was given most of the medical and other records, and based thereon, concluded that a CT scan was called for. No speculation is required to infer that his interpretation of the North Adams hospital record was that the child, if not unconscious, was at least unresponsive.[11] Simi-

---

[11]For us to conclude that a limp, pale, flaccid child, breathing at the rate of four respirations a minute, is or is not "unresponsive" is surely to engage in an appraisal of the weight and credibility of the evidence, an exercise not permitted to us or the tribunal. The standard is clear, the evidence must be viewed in the light most favorable to the plaintiff. We also note that there are other described symptoms in the North Adams hospital rec-

larly, no speculation is required that he inferred that the contusions shown on the autopsy report (an autopsy report which, after all, considered the manner of death to be homicide) should have been visible earlier. That there is evidence in the record, cited by the dissent, that other doctors did not see the contusions is not determinative. "Any factual dispute as to the 'meaning' of the record is for the jury." *Kopycinski* v. *Aserkoff*, 410 Mass. at 418. Thus, whether Dr. Buscho misinterpreted the records or what weight is to be accorded his opinion in relation to contrary evidence are questions that belong to a later stage of the proceedings. *Kilmartin* v. *Lowell Gen. Hosp.*, 23 Mass. App. Ct. 901, 902 (1986). See also *Booth* v. *Silva, ante* 16, 22 (1994).

The judgment of dismissal is affirmed with respect to the nonphysician members of the staff of North Adams Regional Hospital.[12] The judgments of dismissal are vacated and the determinations of the tribunal as to Dr. Sussman, Dr. Muse, nurse LaPlante, Dr. Marz, and Dr. Lieberman (and Baystate insofar as its liability would be based on the conduct of Dr. Marz and Dr. Lieberman), are to be replaced by a decision that the plaintiff's offer of proof, if properly substantiated, is sufficient to raise a legitimate question of liability appropriate for judicial inquiry. The judgment of dismissal as to New England Life Flights, Inc., is vacated and the plaintiff may proceed with his claim against New England Life Flights, Inc., as G. L. c. 231, § 60B, does not apply to it.

*So ordered.*

ord, not comprehensible to us as lay persons, which may have bearing on Dr. Buscho's interpretation of the facts.

[12]Diane Gagne, Marianne Bastian, Jane Soucie, Harold Kline and Donna Rayner.

Rahilly *v.* North Adams Regional Hospital.

APPENDIX.


Robert F. Buscho M.D. F.A.C.E.P.

. . . .                              -


Mr. Edward Spence III

. . . .
1/25/90

RE: Jeremy Rahilly Case

Dear Mr. Spence,

I have reviewed the medical records you supplied to me so as to form an opinion as to whether the care and treatment of Jeremy Rahilly was appropriate and consistent with accepted medical standards.

You provided me with the following records:

1. Ambulance record of North Adams Ambulance Service, Inc., for the transportation of Jeremy Rahilly to the North Adams Hospital.
2. Emergency Room Record and Nurse's Notes, from the North Adams Regional Hospital.
3. Record of the Life Flight Helicopter transportation of the child from the North Adams Regional Hospital to the Baystate Medical Center.
4. Record of the Baystate Medical Center for Jeremy Rahilly.
5. Autopsy report for Jeremy Rahilly following his death.

It is my opinion that a number of individuals who treated Jeremy Rahilly failed to meet accepted medical standards and contributed to his eventual injury and death. Furthermore, there are many elements of medical negligence in this case. I have divided this letter into separate sections in order to more clearly delineate those individuals and entities whose care fell below the standard of care.

North Adams Ambulance Service, Inc., and its EMTS
[omitted]


KAREN BURKE, M.D.
[omitted]


Karen Burke, M.D. and Michael Sussman, M.D

At North Adams Hospital Emergency Department the infant was evaluated by Drs. Sussman and Burke. Neither physician performed and docu-

mented a complete history and physical examination. The proper format for a complete history and physical examination includes:

I. History:
   Chief complaint, present illness; past illness; family history.
II. Review of systems.
III. Physical examination:
   general appearance, skin, head, ears, eyes, nose, mouth, throat, neck, chest, heart, abdomen, genitalia, extremities, and neurologic exam.

In a critically ill child, it is the standard of care to perform a thorough examination, following this format, and to document the results. Had the physicians performed a thorough and systematic exam it is possible they would have found the scalp contusion indicating that the child had a head injury. If it was appreciated that the child had had a head injury, it would have led the physicians to perform a CT scan. A CT scan at North Adams would have shown the intracranial bleed and changed the entire therapeutic care for this baby.

It is my opinion that there were strong indications to perform an emergency CT scan at North Adams Hospital. Not only was there clinical evidence of a head injury that was not appreciated, but also in any unconscious and unresponsive child, a CT scan should be performed to rule out a number of intracranial conditions.

The significance of not performing a CT scan at North Adams Hospital is this: the child's brain injury was caused by increased intracranial pressure, caused by hypoxia. Intracranial bleeding, caused by a head injury, also causes elevated intracranial pressure and injures the brain. The physicians at North Adams Hospital failed to diagnose the increased intracranial pressure in this child. A CT scan would have given this diagnosis, and treatments would have then been undertaken to lower the intracranial pressure.

Increasing intracranial pressure must be diagnosed and treated aggressively to decrease brain damage. This is a neurologic emergency. Intracranial pressure can be lowered. Intubation with hyperventilation to lower arterial carbon dioxide $pCo_2$ to 25-30 torr will lower intracranial pressure. Mannitol 0.25 to 2.0 gm/Kg IV should also be given and repeated every 4 to 6 hours. Corticosteroids, although controversial, should be considered.

The physicians at North Adams Hospital failed to recognize and aggressively treat this infant's increased intracranial pressure. It is my opinion that this further contributed to the brain damage the baby sustained.

The decision was made to transport the infant by New England Life Flight, to Baystate Medical Center in Springfield, MA, where there was a pediatric intensive care unit. In every case in inter-hospital transfers, all arrangements should be carefully coordinated between the two institutions by the physicians. The only acceptable reason for transferring a patient is the lack of ability to care for a patient's particular medical problem at the sending hospital. All inter-hospital transfers must be undertaken when a patient has been stabilized. It is my opinion that the baby was not stabilized when transferred. The baby's increased intracranial pressure had not been diagnosed, was not being treated, and probably was worsening while the baby was being transported.

The transfer was not coordinated in another serious respect. The medical records from North Adams were not transferred with the patient. This is below the standard of care. The medical records carry important diagnostic and therapeutic information that the receiving hospital must know in order to continue the care of the child. Because the records were not transferred between the two hospitals, the infant was subjected to a dangerous procedure (a lumbar puncture) that probably worsened the baby's condition. This will be discussed below. Thus, Drs. Burke and Sussman's decision to transfer a critically ill child, before he was stabilized, and without accompanying medical records, was below the standard of care.

Nursing Staff: North Adams Regional Hospital

Another criticism I have about the care the baby received at North Adams Regional Hospital concerns the nursing care. The baby was critically ill, but during 2.5 hours only one set of complete vital signs was taken. When a patient has increasing intracranial pressure, there can be characteristic changes in the vital signs. A rise in the blood pressure and a fall in the pulse is a response to increased intracranial pressure, called "Cushing's Reflex." Had serial viral [sic] signs been taken, which is the standard of care in critically ill patients, the Cushing's Reflex may have been noted, pointing the medical staff to the diagnosis of increased intracranial pressure. This then would have led to aggressive early intervention to lower the child's intracranial pressure. It is below the standard of care to not monitor a critically ill patient more frequently.

### New England Life Flight, Inc.

It is my opinion that the personnel of New England Flight, Inc. should not have left North Adams without being sure that they were taking the medical records. New England Life Flight, Inc. performs inter-hospital transports all the time and the crews know the importance of transferring medical records. They should have checked to be sure that the records were transferred with the baby.

### Paul Marz, M.D.

The resident physician at Baystate Medical Center, Paul Marz, M.D. performed a lumbar puncture shortly after the baby's arrival. Performing a lumbar puncture in the face of increased intracranial pressure can cause brain herniation and brain death. Performing the lumbar puncture was inappropriate and should have been avoided. In the records, it is noted that the child had a long hypoxic period, and hypoxic brain injury was a major clinical concern. Most physicians would not perform a lumbar puncture in the face of the possibility of increased intracranial pressure for fear of causing brain herniation. If the physicians at Baystate had had the records from North Adams Emergency Department they would have appreciated the possibility that the baby had increased intracranial pressure.

When baby Rahilly arrived at Baystate Medical Center, Dr. Marz performed a lumbar puncture. About 5 hours later, a CT scan was finally performed. It is my opinion that the lumbar puncture should not have been performed until a CT scan was done, and it was certain that the child did not have increased intracranial pressure. Despite the fact that Dr. Marz did not have the medical records from North Adams, it is my understanding that he knew the facts of the case. Thus he should have reasoned that because of the child's respiratory arrest and periods of hypoxia, it was probable that the child was developing increased intracranial pressure, and a CT scan should have been done before doing the lumbar puncture.

Baby Rahilly did sustain a brain herniation. I feel performing a lumbar puncture contributed to the herniation of the infant's brain. It cannot be said that the herniation was solely caused by the lumbar puncture, but it contributed to the child's brain injury.

### Paul Marz, M.D. and Stephen Lieberman, M.D.

Even when Dr. Marz and Dr. Lieberman, the attending physician at Baystate, recognized that the child had sustained an intracranial bleed, as was shown by the lumbar puncture, it took hours to perform a CT scan to diagnose exactly the condition. This was a neurologic emergency. The CT

scan should have been done immediately. This delay contributed to the child's brain injury in that it delayed institution of definitive measures to lower the child's intracranial pressure.

Stephen Lieberman, M.D. and
Baystate Medical Center personnel,
Pediatric Intensive Care Unit

I also question the neurologic care the child received after the CT scan was obtained. The most important way to lower the intracranial pressure in a patient is to lower the arterial carbon dioxide by hyperventilating the patient. The baby's serial arterial carbon dioxide concentrations for 8/7 were as follows:

| *Time* | *pCo2* |
|--------|--------|
| 0350 | 24 |
| 0930 | 34 |
| 1010 | 20 |
| 1050 | 25 |
| 1210 | 32 |
| 1330 | 32 |
| 1520 | 35 |
| 1630 | 32 |
| 1720 | 33 |
| 1900 | 46 |
| 1930 | 39 |

The pCo2 should have been kept below 30. As can be seen, for seven hours the medical staff at Baystate were unable to hyperventilate the child to the recommended arterial carbon dioxide concentration for lowering the intracranial pressure. This is below the standard of care in my opinion. The child had a prolonged period where his intracranial pressure was not treated by recommended standards. In fact, the CT scan taken on 8-6:0800 and 8-7:0938 showed progressive deterioration of the child's brain.

Stephen Lieberman, M.D.

Pediatric Neurology consultation was obtained on August 8, 1988, at 8:00 a.m. Stephen Lieberman, M.D., as the attending and primary physician, should have called for Pediatric Neurosurgical consultation on an emergent basis on August 7, after the results of the CT scan were known. Neurosurgeons have the most experience in treating patients with increased intracranial pressure, and they utilize a number of devices to accurately monitor it. I believe these would have been helpful in monitoring the

results of treatment in this child. I think the standard of care at Baystate would have been to obtain Neurosurgical consultation expeditiously.

In conclusion, in the evolution of the care of this infant, it is my opinion that there are many areas of negligence which eventually led to the child's brain death. I hope that this letter will be helpful in clarifying some of these areas.

If I can be of further assistance in this matter or if you have further questions, please contact me at any time.

Sincerely yours,

Robert F. Buscho MD FACEP

GILLERMAN, J. (dissenting). I dissent, respectfully, because I conclude that the claims against the appellees are frivolous, and that permitting the prosecution of such claims defeats the legislative purpose in enacting G. L. c. 231, § 60B. See *Paro* v. *Longwood Hosp.*, 373 Mass. 645, 651 (1977); *Denton* v. *Beth Israel Hosp.*, 392 Mass. 277, 280 (1984).

1. *Dr. Sussman.* Dr. Buscho writes that "[h]ad . . . [Dr. Sussman] performed a thorough and systematic exam [of the child] it is possible they would have found the scalp contusion indicating that the child had a head injury." The fact is that this record does not reveal any direct evidence that there was a head injury prior to the time the child was admitted to the North Adams Regional Hospital (NARH), or that any contusion, if there was one on August 6, was observable on that day.

Sussman, the child's regular pediatrician, conducted a physical examination of the child in the early morning hours of August 6, 1988. The plaintiff's offer of proof admits it, and the hospital records substantiate it. No clinical evidence of a head injury is recorded. Sussman also took a history from the child's father, the plaintiff in this case. The father said that the child had taken his formula at 11:30 P.M. A

short while later the father noticed that the child was having difficulty breathing. As he lifted the child out of bed, the child stopped breathing, and the father began mouth-to-mouth resuscitation. The child vomited cereal, and the police were called. There is nothing of a head injury in this history; Buscho's speculation of a head injury is contradicted by his client, the plaintiff.

The child was examined again upon arrival at the Baystate Medical Center by Dr. Marz. He testified before the grand jury (the transcript of a portion of which is in the plaintiff's offer of proof) that he found that there "were no outside marks to indicate any head trauma. . . ."

Dr. Buscho does not identify the source for his statement that there was a "scalp contusion" to be seen on August 6, 1988, but the majority of the panel speculates in note 5, *supra*, that Buscho may have referred to a "scalp contusion" which appears in the report of the autopsy conducted on August 11, 1988, one day after the date of death and six days after the date of the original injury. The report states a finding of "a faint contused zone measuring 1½ x 2 inches."

Solely on the basis of the August 11 autopsy report establishing a "faint contused zone" as of that date, Buscho constructs his edifice of malpractice: the contusion noted on August 11 means there was a head injury on or before August 5, 1988; the contusion was there to be seen by Sussman on August 6, but Sussman negligently failed to see it; had Sussman seen the contusion he would have "appreciated that the child had had a head injury"; that information was enough to call for a CT scan; the scan would have shown an intracranial bleed, and that would have "changed the entire therapeutic care of the baby," for the intracranial bleed is what causes increased intracranial pressure which, in turn, causes brain damage, and ultimately, death.

Quite aside from the fact that the child's father did not report any head injury, and that neither Sussman nor Marz saw a contusion (if it was there on August 6), what is missing is any reason to believe that the characteristics of the contusion seen on August 11 lead to the conclusion that

(i) the contusion probably existed, and could have been seen, on August 6, and (ii) that the contusion probably reflected a head injury on August 5 or earlier. Buscho did not opine as to this in his report. And certainly the majority is not qualified to draw the inferences.

Marz testified that the first indication of the possibility of any head trauma was revealed by the lumbar puncture on August 6; the lumbar puncture is what prompted the CT scan done at 8 A.M. on August 6. But this scan on August 6 showed no evidence of any increased pressure within the infant's brain. The increased intracranial pressure did not appear until the CT scan done on August 7 at 9:30 A.M. Thus, Buscho's charge that there were "strong indications" that a scan on August 6 at NARH would have revealed increased intracranial pressure has no basis in the record.[1] The majority replies that had Sussman diagnosed the intracranial bleeding early on August 6, the later developing increased intracranial pressure "would have been anticipated and treated preventively." But the assumption of intracranial bleeding in the early morning hours of August 6 at NARH (before the lumbar puncture at Baystate) is the purest conjecture; it is based on the further assumption that there had been a serious head injury prior to August 6, which, in turn, is based on the assumption that the contusion seen on August 11 was evidence of that serious, prior head injury. This is not a "grudging" reading of Buscho's letter. It is, perhaps, a

---

[1]Buscho's letter states that there were "strong indications to perform an emergency CT scan at North Adams Hospital" based upon the "clinical evidence of a head injury that was not appreciated, but also in any unconscious and unresponsive child . . . ." The NARH hospital record states the following: "Admitted in arms of EMT w/oral airway in place. Infant flacid — cried very small amount. Did attempt to withdraw when IV was — tube inserted by Dr. Burke." It is plain that the child was neither unconscious nor unresponsive upon admission — and I have discussed the absence of any clinical evidence of a head injury in the text. Finally, the statement that there were "strong indications to perform an emergency CT scan" is hardly a statement that Sussman failed to conform to the required standard of care. See *Bradford* v. *Baystate Med. Center*, 415 Mass. 202, 206 n.5 (1993) (physician liability cannot be based upon generalities in the reports of the plaintiff's expert).

careful reading, but that, I believe, is what the statute calls for.

Buscho makes the additional charge against Sussman that the child was transferred to Baystate before he had been "stabilized." The difficulty, according to Buscho, was that the "increased intracranial pressure had not been diagnosed, was not being treated, and probably was worsening . . . ." But, again, there was no evidence in this record of any increased intracranial pressure until one full day after the transfer to Baystate. Buscho clings to his assumption that there had been an early serious head injury, but the plaintiff himself refutes Buscho's gratuitous claim, and there is nothing in the record that supports Buscho's position.

Buscho also charges that the medical records from NARH were not transferred with the child, and that this is "below the standard of care." Nowhere does Buscho identify who was responsible for making certain that the records were on board with the child, but because the charge is included in the paragraphs of the letter dealing with Sussman we are left to surmise that Sussman must be the one who failed. But conjecture as to professional responsibility is precisely what is not permitted.[2]

2. *Dr. Muse and nurse LaPlante.* The offer of proof as to these two defendants is alleged to be their failure to make sure that the medical records were on board the helicopter flight. Assuming the records were not on board — an issue left vague in this record — Buscho's argument is that with the records in hand the Baystate physicians "would have appreciated the possibility that the baby had increased intracranial pressure." What in the records creates that possibility? Even the majority looks to the autopsy report of August 11 for evidence of a head trauma, and there is simply nothing else. Indeed, Buscho faults Sussman for *not* discovering the supposed increased intracranial pressure.

---

[2]The majority attempts, in note 9, *supra*, to resolve the difficulty by relying on testimony which suggested that the responsibility was Sussman's "in a general way." That is hardly a basis upon which a medical malpractice suit should be prosecuted.

3. *Dr. Marz, Dr. Lieberman, and Baystate.* The majority, conceding difficulties with Buscho's opinion, in the end faults Marz and Lieberman only for the delay of several hours in the performance of a CT scan. This charge cannot be sustained. The plaintiff's written offer of proof notes that the lumbar puncture was performed between 3:30 A.M. and 5 A.M., following which "Dr. Marz requested a CAT scan, 'as soon as possible.' " In fact the scan was not performed until 8 A.M. What reason is there to believe that either Marz or Lieberman was responsible for the delay? What reason is there to believe that the scan was *not* done "as soon as possible?" If there were answers to these questions they are not to be found in this record, in Buscho's opinion letter, or in the opinion of the majority.[3]

The medical tribunal rightly concluded that the plaintiff's offer of proof failed as to the appellees, and I would affirm the judgment.

---

[3]This case is not controlled by *Booth* v. *Silva, ante* 16, 21 & n.7 (1994). In *Booth*, the opinion of the expert was not substantiated by the evidence in the offer of proof; in this case the expert's opinion is contradicted by the evidence in the offer of proof.