NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-1568                                          Appeals Court

   JESUS FELICIANO, personal representative,[1]  vs.  CARA ATTANUCCI
                            & another.[2]


                        No. 17-P-1568.

      Suffolk.     September 10, 2018.  -  March 11, 2019.

        Present:  Wolohojian, Lemire, & Englander, JJ.


Medical Malpractice, Tribunal, Appeal, Expert opinion.
     Negligence, Doctor, Medical malpractice, Expert opinion.
     Evidence, Expert opinion.  Witness, Expert.


     Civil action commenced in the Superior Court Department on
January 29, 2016.

     A motion to dismiss was considered by Linda E. Giles, J.,
and entry of separate and final judgment was ordered by her.


     Barrie E. Duchesneau for the plaintiff.
     John D. Cassidy for the defendants.
     Lisa Wichter, for Licia Raymond & others, was present but
did not argue.
     Noah A. Rabin, for Lisa Dunn-Albanese & others, was present
but did not argue.


_____

     [1] Of the estate of Natasha Feliciano.

     [2] Henry Lerner.

WOLOHOJIAN, J.  At issue in this appeal is a medical malpractice tribunal's conclusion that the plaintiff failed to raise a legitimate question of liability with respect to Dr. Cara Attanucci and Dr. Henry Lerner, both of whom were involved in the care of the plaintiff's decedent, Natasha Feliciano (Feliciano)[3] at Newton-Wellesley Hospital, where Feliciano died after protracted, and then arrested, labor, an emergency bedside cesarean section, and a subsequent emergency bedside hysterectomy.  We vacate the judgment of dismissal.

We summarize the evidence in the plaintiff's offer of proof in the light most favorable to the plaintiff.  Blake v. Avedikian, 412 Mass. 481, 484 (1992), citing Kopycinski v. Aserkoff, 410 Mass. 415, 417-418 (1991).  Feliciano, a healthy twenty-nine year old mother of two children, was thirty-eight and one-half weeks pregnant with her third child when she presented herself at Newton-Wellesley Hospital at 11:28 P.M. on August 10, 2014, complaining of labor.  She died at the hospital twenty-five hours later from hemorrhagic shock, disseminated

---

[3] The plaintiff and the plaintiff's decedent share a surname.  For clarity, we refer hereafter to Jesus Feliciano as the plaintiff and to Natasha Feliciano as Feliciano.

intravascular coagulation,[4] and amniotic fluid embolism.[5] Summarized in general layman's terms, Feliciano died because (a) the defendants failed to timely recognize that her condition required a cesarean section, and Feliciano "coded," (b) the defendants failed to ensure, after performing an emergency bedside perimortem cesarean section, that Feliciano's abdomen be left open to monitor for uterine bleeding and failed to place her in or near an operating room in case an emergency hysterectomy was also required,[6] (c) the defendants failed

---

[4] According to the plaintiff's expert, Dr. S. Jason Kapnick, "[d]isseminated intravascular coagulation is a process that describes widespread activation of the clotting cascade that results in the formation of small clots in small blood vessels throughout the body."

[5] The plaintiff's expert stated that

"[a]mniotic fluid embolism is a rare but serious complication that can occur during labor and delivery. An amniotic fluid embolus occurs when amniotic fluid or fetal material including hair, nails, fetal cells, and/or vernix enters the maternal bloodstream. This occurs during labor or immediately after delivery. Symptoms indicating a potential amniotic fluid embolism include sudden shortness of breath, pulmonary edema, sudden cardiovascular collapse, disseminated intravascular coagulation, altered mental status, tachycardia, fetal distress, abnormal maternal heart rate, seizures, nausea, and/or vomiting. Risk factors for amniotic fluid embolus include the following: placental problems -- previa or abruption, preeclampsia, induction of labor with medications, and a tumultuous labor, as in Ms. Feliciano's case."

[6] According to the plaintiff's expert,

"[a]fter a peri-mortem bedside cesarean section is performed in response to a presumed amniotic fluid embolus

thereafter to sufficiently monitor her and failed to recognize that her condition necessitated a hysterectomy until after she again "coded," (d) the defendants waited too long to perform the emergency hysterectomy, and (e) the defendants performed the emergency hysterectomy in Feliciano's bed and without proper medical tools (such as a scalpel) because of the delay in performing the procedure and because of the earlier failure to place her in or near an operating room.[7]  The plaintiff's expert's opinion is that the defendants' medical treatment fell below the accepted standard of care and resulted in Feliciano's injury, suffering, and premature and preventable death.  We set out additional facts below as they relate to the specific arguments raised on appeal.

---

and ensuing [disseminated intravascular coagulation] is anticipated, then the accepted standard of care requires the obstetrician and/or maternal fetal medicine physician to leave the patient's abdomen open to directly visualize and appreciate uterine tone, and move the patient to the recovery room nearest to the operating room in the event an emergent hysterectomy is required.  Additionally, if the main source of severe bleeding is from the uterus, as in Ms. Feliciano's case, then the standard of care requires the average qualified obstetrician and/or maternal fetal medicine physician, to order and perform an emergent hysterectomy if the bleeding is unable to be controlled to save the patient's life."

[7] The plaintiff's expert noted that "[a]s a result of waiting this long, Dr. Raymond [the surgeon] manually removed the staples, and the cesarean incision was opened manually as well due to the lack of necessary tools, including a scalpel, that were absent in the ICU room."

The plaintiff filed this medical malpractice and wrongful death action against (among others) a number of doctors and nurses who were involved in Feliciano's treatment at Newton-Wellesley Hospital. The plaintiff's offer of proof included the detailed expert opinion of Dr. S. Jason Kapnick, a licensed physician board certified in obstetrics and gynecology and gynecological oncology, together with his curriculum vitae. It also included medical records from Newton-Wellesley Hospital, fetal monitoring strips, an autopsy report from Massachusetts General Hospital, and Feliciano's death certificate. After a hearing, a medical malpractice tribunal found that the evidence did not raise a legitimate question of liability with respect to Newton-Wellesley Obstetrics and Gynecology, P.C., and with respect to two of the individual physicians, Dr. Cara Attanucci and Dr. Henry Lerner. After the plaintiff failed to post a bond with the Superior Court, see G. L. c. 231, § 60B, the claims against Drs. Attanucci and Lerner, as well as those against Newton-Wellesley Obstetrics and Gynecology, P.C., were dismissed, and a separate and final judgment entered pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974). At issue before us are only the claims against Drs. Attanucci and Lerner.[8]

_____

[8] The plaintiff did not identify Newton-Wellesley Obstetrics and Gynecology, P.C., in his notice of appeal, nor does he make any argument on appeal with respect to the dismissal of the claim against the professional corporation.

A plaintiff's offer of proof shall prevail before a medical malpractice tribunal (1) if the defendant is a health care provider as defined in G. L. c. 231, § 60B,[9] see Santos v. Kim, 429 Mass. 130, 133-134 (1999),[10] "(2) if there is evidence that the [health care provider's] performance did not conform to good medical practice, and (3) if damage resulted therefrom," Kapp v. Ballantine, 380 Mass. 186, 193 (1980). The tribunal is not to engage in weighing the evidence or determining credibility, Keppler v. Tufts, 38 Mass. App. Ct. 587, 589 (1995), and "[a]ny factual dispute as to the meaning of the record is for the jury." Rahilly v. North Adams Regional Hosp., 36 Mass. App. Ct. 714, 723 (1994), quoting Kopycinski, 410 Mass. at 418.

---

[9] General Laws c. 231, § 60B, provides in relevant part:

"For the purposes of this section, a provider of health care shall mean a person, corporation, facility or institution licensed by the commonwealth to provide health care or professional services as a physician, hospital, clinic or nursing home, dentist, registered or licensed nurse, optometrist, podiatrist, chiropractor, physical therapist, psychologist, social worker, or acupuncturist, or an officer, employee or agent thereof acting in the course and scope of his employment."

[10] In Santos, 429 Mass. at 132-133, the Supreme Judicial Court stated that "[§] 60B does not require the existence of a doctor-patient relationship as a predicate for its application," and that "[t]he term doctor-patient relationship," although it has "become boilerplate[,] . . . is unfortunate." Accordingly, we do not use the "doctor-patient relationship" formulation of Kapp v. Ballantine, 380 Mass. 186, 193 (1980). See Saunders v. Ready, 68 Mass. App. Ct. 403, 404 (2007).

The task of the medical malpractice tribunal is a "narrow" one, in which "the tribunal should simply examine the evidence proposed to be offered on behalf of the patient to determine whether that evidence, 'if properly substantiated,'" (citation omitted), McMahon v. Glixman, 379 Mass. 60, 69 (1979), "is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result."  G. L. c. 231, § 60B.  "[T]he evidence presented by the offer of proof is viewed by a standard comparable to a motion for a directed verdict, that is, in a light most favorable to the plaintiff."  Blake, 412 Mass. at 484, citing Kopycinski, 410 Mass. at 415, 417-418.  "That standard is whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.'"  Dobos v. Driscoll, 404 Mass. 634, 656, cert. denied, 493 U.S. 850 (1989), quoting Poirier v. Plymouth, 374 Mass. 206, 212 (1978).

Although the tribunal's role vis-à-vis the plaintiff's evidence is comparable to the directed verdict standard in the sense that the plaintiff's offer of proof is to be viewed in the light most favorable to the plaintiff, the standards are not "one and the same."  Kopycinski, 410 Mass. at 415.  It is important to remember that the tribunal's evaluation of the

plaintiff's offer of proof occurs at a very different stage of the litigation than does a judge's evaluation of the evidence on a motion for directed verdict.  Whereas a motion for directed verdict comes after discovery has been completed, the plaintiff's legal claims and theories have been tested through pretrial dispositive motions, expert opinions have been tested and vetted through Lanigan motions, see Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994), and the plaintiff's witnesses and documentary evidence have been admitted and cross-examined at trial, the offer of proof before the tribunal is made without the benefit of discovery and at the earliest stage in the life of the litigation -- even before motions to dismiss.  For this reason, the statute explicitly contemplates that a plaintiff's offer of proof to the tribunal need not meet the full evidentiary burden of proof at trial; instead, the offer of proof, taken in the light most favorable to the plaintiff, need only be sufficient to raise a legitimate question of liability, with proper evidentiary substantiation to follow.  See, e.g., McMahon, 379 Mass. at 69.  This principle is directly reflected in the language of the statute, which highlights that the evidence in the offer of proof will be the subject of future substantiation in the course of litigation.  See G. L. c. 231, § 60B ("said tribunal shall determine if the evidence presented if properly substantiated is sufficient to raise a legitimate

question of liability" [emphasis added]). Thus, at this stage, we do not require that the plaintiff's proof be complete, merely that it be enough to "raise a legitimate question of liability appropriate for judicial inquiry." Id. In short, not all factual questions need be answered or resolved at this stage.

Consistent with this, the admission of expert opinion before the tribunal is not subject to the same strictures as are required for admission at trial. Indeed, "[t]he standard for admission of expert testimony before a medical malpractice tribunal is an extremely lenient one." Halley v. Birbiglia, 390 Mass. 540, 543 n.4 (1983). Heyman v. Knirk, 35 Mass. App. Ct. 946, 947-948 (1993). "[T]he tribunal may not refuse to accept an expert's opinion unless the plaintiff's offer of proof is so deficient that as a matter of law it would be improper for any judge to admit it." Nickerson v. Lee, 42 Mass. App. Ct. 106, 111 (1997). Extrinsic evidence is not required to substantiate the factual statements in an expert's opinion, and "a factually based statement by a qualified expert, without more, is sufficient to meet the tribunal standard" (emphasis added). Booth v. Silva, 36 Mass. App. Ct. 16, 21 (1994).

With these legal principles in mind, we turn to examining the specifics of the offer of proof with respect to Drs. Attanucci and Lerner. As to Dr. Attanucci, the offer of proof sufficiently established that she was a health care provider to

Feliciano: Dr. Attanucci assisted in the emergency perimortem bedside cesarean section.[11] See Lambley v. Kameny, 43 Mass. App. Ct. 277, 283 (1997) ("The essence of the doctor-patient relationship is the undertaking by a physician to diagnose and/or treat the person being diagnosed or treated with reasonable professional skill"). A legitimate question of Dr. Attanucci's liability was raised by the opinion of the plaintiff's qualified expert that Dr. Attanucci deviated from the accepted standard of care when she (along with others) "failed to leave Ms. Feliciano's abdomen open for close monitoring and evaluation of uterine bleeding," failed "to keep Ms. Feliciano in the operating room or in the nearest recovery unit, so that all necessary tools were readily available in the event an emergency hysterectomy was required," and, upon recognition of uterine atony, "failed to perform an emergent hysterectomy." Furthermore, Dr. Kapnick opined that these deviations from the standard of care resulted in harm to

---

[11] The operative report of the emergency cesarean section, prepared by Dr. Raymond, shows that Dr. Attanucci responded to the "code blue" and acted as second assistant in the surgery. The record does not state that the doctor's relationship ended (or, if so, when), nor does it support the defendants' contention that Dr. Attanucci acted merely as a de facto "scrub nurse," which, in any event, is a factual dispute not amenable to disposition by the tribunal. Contrast St. Germain v. Pfeifer, 418 Mass. 511, 520 (1994) (where patient transferred out of doctor's care and there was no evidence of treatment after that transfer, no doctor-patient relationship existed).

Feliciano, including her premature and preventable death. Nothing more was required to raise a legitimate question of liability with respect to Dr. Attanucci.

The same is true of Dr. Lerner, who (along with others) performed a bedside laparotomy and assisted in the emergency hysterectomy. He was also present at Feliciano's bedside when she died. On these bases, the offer of proof was sufficient to establish that Dr. Lerner was a provider of health care to Feliciano. See Lambley, 43 Mass. App. Ct. at 283-284. As to liability, Dr. Kapnick opined that Dr. Lerner (along with others) "waited far too long in performing an emergency hysterectomy in the ICU bed." An opinion of delay such as this is sufficient as an offer of proof. See Kopycinski, 410 Mass. at 418 (element satisfied by expert affidavit alone); Rahilly, 36 Mass. App. Ct. at 722 (allegation of delay sufficient). Although extrinsic evidence is not necessary to support the expert's opinion at this stage, we note that such evidence was present here. The medical records show that the emergency hysterectomy was not performed until approximately one hour after the medical records indicate Dr. Lerner arrived for the procedure, and that Feliciano's condition necessitated a hysterectomy by the time Dr. Lerner arrived. On this basis, a sufficient question of liability against Dr. Lerner was raised by the offer of proof.

Dr. Kapnick also opined that Dr. Lerner (along with others) failed to frequently assess Feliciano for active vaginal bleeding, failed to monitor her in the recovery room, failed to consult with an interventional radiologist regarding the need for arterial embolization, and failed to recognize or appreciate when the massive transfusion protocol failed to reverse her coagulopathy.[12]  Given the medical record's silence about when, precisely, Dr. Lerner's involvement with Feliciano's care began, we note that it is a closer question with respect to these additional theories of liability against him.  But, again, these are matters to be determined after discovery, when the precise beginning of Dr. Lerner's involvement in Feliciano's care will be learned.  That factual question should not have been decided against the plaintiff, without the benefit of discovery, at this stage.

The findings of the tribunal as to Dr. Attanucci and Dr. Lerner are to be replaced by the decision of this court that the offer of proof of the plaintiff, if properly substantiated, is sufficient to raise a legitimate question of liability

---

[12] It is true, as the dissent points out, that these same bases of liability are alleged against many of the other defendants.  But that neither surprises nor concerns us; the medical record shows that the defendants (at different moments and in different combinations) were all involved in Feliciano's care, and that the medical events at issue took place over a short span of time.

appropriate for judicial inquiry.  The judgment of dismissal as to Dr. Attanucci and Dr. Lerner is vacated, and the plaintiff may proceed with his claims.

<u>So ordered</u>.

ENGLANDER, J. (dissenting in part).  The question is whether the plaintiff's offer of proof contained sufficient evidence to raise a legitimate question of liability with respect to Drs. Attanucci and Lerner, two of the many doctors that were involved in the care of the patient, the plaintiff's decedent.[1]  G. L. c. 231, § 60B.

As to Dr. Attanucci, I concur that the offer of proof was sufficient.  The medical records show that Dr. Attanucci assisted in the care of the patient during an emergency cesarean section, which occurred at approximately 2 P.M. on the day in question.  The expert submission from Dr. Kapnick opines as to several breaches of the standard of care that occurred during that operation or during the patient's postoperative care.  Given that Dr. Attanucci assisted with the cesarean section, Dr. Kapnick's opinions as to Dr. Attanucci's breaches are sufficient to meet the applicable standard.  See Little v. Rosenthal, 376 Mass. 573, 578 (1978).

The same is not true for Dr. Lerner, however, and I respectfully dissent from the majority's conclusion as to him. The only mention of Dr. Lerner in the medical records is that he appeared at the patient's bedside at 9:25 P.M., when the patient

---

[1] The tribunal concluded that there was sufficient evidence as to several defendants other than Drs. Attanucci and Lerner.

was already in extremis, and well after the breaches identified by Dr. Kapnick had already occurred.  There is nothing in the medical records that shows that Dr. Lerner had any knowledge prior to 9:25 P.M. of the patient's circumstances on that day, or of the care she was receiving.  Moreover, there is no contention in Dr. Kapnick's expert submission that the care provided after Dr. Lerner arrived at 9:25 P.M. was in any way deficient.  The failures the expert alleges all occurred many hours prior to 9:25 P.M.

The medical malpractice tribunal was established to provide a screening process for medical malpractice complaints, in order to "discourage frivolous claims whose defense would tend to increase premium charges for medical malpractice insurance." McMahon v. Glixman, 379 Mass. 60, 68 (1979), quoting Austin v. Boston Univ. Hosp., 372 Mass. 654, 655 n.4 (1977).  The plaintiff submits an "offer of proof," which is evaluated for whether it provides sufficient evidence to satisfy a standard comparable to a "directed verdict" standard.  See Little, 376 Mass. at 577-579; Cooper v. Cooper-Ciccarelli, 77 Mass. App. Ct. 86, 91 (2010).  The standard of proof is not stringent, but it is not without teeth; the plaintiff must come forward with evidence "to raise a legitimate question of liability appropriate for judicial inquiry."  G. L. c. 231, § 60B.

The majority concludes that the offer of proof is sufficient as to Dr. Lerner in part because it articulates a very relaxed standard of proof. In particular, the majority seems to assert that statements made by experts <u>must</u> be accepted by the tribunal, even if those statements are not supported by the medical records. A standard that requires that statements in expert opinions be accepted, even when not substantiated by the documentary record, is not consistent with the statutory scheme or our case law.

First, the statutory scheme contemplates a screening process where evidence will be presented, and where that evidence will be evaluated, to some degree, and not just accepted. Thus the statute expressly refers to the submission of "evidence," and it goes on to define the types of "evidence" that are "admissible." G. L. c. 231, § 60B. It describes means for the tribunal "to substantiate or clarify any evidence which has been presented before it." <u>Id</u>. This process obtains despite the absence of discovery. The statute even references a standard -- "substantial evidence" -- which "shall mean such evidence as a reasonable person might accept as adequate to support a conclusion." <u>Id</u>.

Thus, the language and structure of G. L. c. 231, § 60B, contemplate a role for the tribunal that is evaluative, and that involves more than the undiscerning acceptance of the assertions

in an offer of proof.  This more evaluative role has been reflected in the case law, from very early on.  Thus, in Little, 376 Mass. at 578, the Supreme Judicial Court expressly rejected the plaintiff's assertion that the tribunal should apply a standard analogous to that applied to a motion to dismiss.  The court analyzed the statutory scheme and concluded that "the tribunal's mandate is to evaluate evidence."  Id.  It stated that the tribunal's task should be compared "to the trial judge's function in ruling on a defendant's motion for directed verdict," and it went on to affirm the tribunal's conclusion that the offer of proof was insufficient.  Id.  Two years later, in Kapp v. Ballantine, 380 Mass. 186, 191-193 (1980), the court applied the standard from Little in concluding that the plaintiff's offer of proof was sufficient as to some defendants, but not others.  Relevant here, the court held as to one defendant, Dr. Levy, that the contention that he was "part of a consulting team" was insufficient, where the evidence did not support the contention that Dr. Levy had participated in the medical care claimed to be deficient.  Id. at 195.

The decisions of this court have applied this evaluative standard as well; notably, the standard has been applied to reject offers of proof even where they are supported by an expert report.  Thus, in LaFond v. Casey, 43 Mass. App. Ct. 233, 237 (1997), this court affirmed a tribunal's rejection of an

offer of proof that was supported by an expert opinion; the opinion stated that doctors had breached the standard of care during a childbirth, and had thereby subjected the newborn baby to "prolonged hypoxia." This court agreed the offer was nevertheless insufficient, concluding that the expert's opinion "is based upon an assumption of facts that have no roots in the evidence." Id. And in Cooper, 77 Mass. App. Ct. at 92-93, this court again rejected an offer of proof because the expert's opinion was "not rooted in the evidence." In affirming the tribunal, we noted that "the deficiency in Dr. Sargent's opinion is not revealed merely by his lack of specificity in fixing the defendant's standard of care, but rather because his opinion lacked any consideration of the defendant's actual conduct in seeking out the higher expertise of the radiologists with whom she consulted" (emphasis supplied). Id. at 93.[2]

---

[2] The majority's view of the standard appears to be influenced by statements in the cases to the effect that the tribunal should not "determine credibility" or "weigh the evidence." See, e.g., Blood v. Lea, 403 Mass. 430, 433 n.5 (1988); Kapp, 380 Mass. at 191. But one can agree with those principles without also concluding that an expert's opinion must be accepted even where it is inconsistent with, or not supported by, the medical records. Indeed, the case law contains several examples where an expert opinion has not been so accepted, because, as here, the opinion is founded upon facts or assumptions not supported by other evidence before the tribunal. The statement the majority cites from Booth v. Silva, 36 Mass. App. Ct. 16, 21 (1994), accordingly must be understood as stating only that a factually based statement of an expert can be sufficient to meet the standard, not that it must be so accepted. Indeed, in Booth the facts that were challenged in

Here, consistent with the standards and case law described above, the tribunal separately considered the facts as to each defendant, and concluded that although the offer was sufficient as to several defendants, it was not sufficient as to Dr. Lerner. In my view, that conclusion was correct. The expert's submission indiscriminately lumps Dr. Lerner with several of the other doctors, asserting that Dr. Lerner should have taken certain steps in connection with events, such as the cesarean section, that took place several hours before Dr. Lerner arrived at the patient's bedside. Thus, the expert asserts, for example, that Dr. Lerner failed to "monitor Ms. Feliciano in the recovery room" after the cesarean section, and concludes that he failed to "promptly perform a hysterectomy" "no later than 4:30 P.M." But the expert's submission does not offer any basis for believing that Dr. Lerner had any involvement with the patient's care at those times. As to Dr. Lerner the submission is, as the judge on the tribunal observed, a cut and paste job. It fails to show a provider-patient relationship at a relevant time, and it accordingly fails to present evidence that Dr. Lerner deviated from the applicable standard of care. No reasonable

_____

the expert opinion actually were independently found in the record. Id. at 18-19 & nn.5, 6.

fact finder could find Dr. Lerner liable, on the facts presented with the offer of proof.

The majority rests its contrary conclusion on the expert's statement that Dr. Lerner (along with others) "waited far too long in performing an emergent hysterectomy in the ICU bed." But the expert's more detailed contention was that the hysterectomy should have been performed "no later than 4:30 P.M." -- a time when there was no evidence that Dr. Lerner was yet involved. In such circumstances the expert's assertion that Dr. Lerner was in breach of the standard of care need not be accepted, because it is not "rooted in the evidence." Such is the kind of evaluation of evidence that is contemplated by the statute, and confirmed in cases such as Cooper, 77 Mass. App. Ct. at 93, and LaFond, 43 Mass. App. Ct. at 237.

Finally, the majority posits that even if Dr. Lerner did not arrive at the patient's bedside until 9:25 P.M. (as reflected in the medical records), in any event the hysterectomy was not performed until one hour later, and this one-hour delay was itself sufficient to satisfy the standard. The contention that liability hinges on a delay from 9:25 P.M. to 10:40 P.M., however, is not set forth in Dr. Kapnick's expert opinion, nor is such an argument made in the plaintiff's brief. To make an adequate showing the plaintiff would have to establish that this one-hour delay could have caused the patient's death, see

Bradford v. Baystate Med. Center, 415 Mass. 202, 206-208 (1993); Keppler v. Tufts, 38 Mass. App. Ct. 587, 590-591 (1995), and the plaintiff has not done so.  Indeed, there is no support in the record for the contention that any care that was provided after Dr. Lerner arrived at 9:25 P.M. was causally related to the patient's death.  The tribunal's conclusion accordingly should not be overturned on that ground.

For these reasons, I would vacate the judgment as to Dr. Attanucci, but affirm it as to Dr. Lerner.