SUPREME JUDICIAL COURT 
 
 JEAN BENNETT, personal representative,[1] vs. MICHAEL COLLINS

 
 Docket:
 SJC-13740
 
 
 Dates:
 September 5, 2025. - November 17, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Barnstable
 

 
 Keywords:
 Medical Malpractice, Appeal, Tribunal, Standard of care. Negligence, Medical malpractice, Standard of care, Causation, Expert opinion. Practice, Civil, Motion to dismiss.
 
 

             Civil action commenced in the Superior Court Department on July 7, 2023.
            A motion to dismiss was considered by Thomas J. Perrino, J., and entry of separate and final judgment was ordered by him.
            The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.
            Adam R. Satin (Peter A. Ghattas also present) for the plaintiff.
            John M. Waldron for the defendant.
            GAZIANO, J.  The plaintiff, Jean Bennett, as personal representative of the estate of her husband, Ronald Bennett, brought a medical malpractice action against several medical providers alleging deviations from the accepted standards of care in their treatment of her husband, leading to his premature and preventable death.[2]  In response, several defendants, including nurse practitioner Michael Collins, filed demands for a medical malpractice tribunal pursuant to G. L. c. 231, § 60B (§ 60B), and Rule 73 of the Rules of the Superior Court (2020) (rule 73).  After a hearing, the tribunal determined that, as to Collins, the plaintiff's offer of proof was not sufficient to raise a legitimate question of liability appropriate for judicial inquiry.  The plaintiff's claims against Collins were thereafter dismissed after she failed to post a bond.  We now hold that the decision of the tribunal was erroneous and accordingly vacate the judgment of dismissal.
            Background.  1.  Facts.  We summarize the evidence in the plaintiff's offer of proof in the light most favorable to the plaintiff.  Feliciano v. Attanucci, 95 Mass. App. Ct. 34, 37 (2019), citing Blake v. Avedikian, 412 Mass. 481, 484 (1992).  This lawsuit involves the decedent's treatment for a shoulder injury beginning on July 6, 2020, until his death on August 8, 2020, with Collins attending to him from August 4 to August 5, 2020.  On July 6, the decedent, a fifty-eight year old man, presented to the emergency department at Cape Cod Hospital (CCH or hospital) via ambulance because he was unable to use his left arm.  He reported that he had fallen approximately two weeks prior and did not experience pain until one week afterward.  Dr. Jeffrey Herbst examined the decedent and diagnosed him with rotator cuff tendinitis and a localized skin infection on his hand.  After Herbst prescribed an antibiotic, the decedent was discharged from the emergency department with plans to follow up with his primary care provider at an upcoming appointment that week.
            Four days later, on July 10, the decedent returned to CCH's emergency department due to increased and worsening pain in his left hand and shoulder, with the antibiotic having failed to improve his condition.  The decedent was examined by physician assistant Benjamin Hixon, who confirmed the presence of left shoulder pain and diagnosed the decedent with cellulitis of the left hand.  After determining that no laboratory work was indicated and that no repeat imaging was necessary,[3] Hixon discharged the decedent with prescriptions for different antibiotics.  Although Dr. Kristen Liska was the attending physician during this visit to the CCH emergency department, Liska did not examine or treat the decedent.
            With the decedent continuing to experience left shoulder pain in the ensuing days, his primary care physician referred him for an orthopedic evaluation with Dr. John Willis, an orthopedic surgeon at Cape Cod Orthopedics and Sports Medicine, P.C. (Cape Cod Orthopedics), in Sandwich, where he was seen on August 3.  During the visit, the decedent described sharp, aching pain; decreased mobility; and weakness.  After the evaluation, Willis determined that the decedent possibly was suffering from a "massive" rotator cuff tear of the left shoulder.  He recommended magnetic resonance imaging (MRI) to evaluate the decedent's rotator cuff, with a follow-up appointment.
            On the next day, August 4, at 9:42 P.M., the decedent again went to CCH's emergency department by ambulance, this time with complaints of general weakness that had lasted for sixteen hours, left shoulder pain after chiropractic manipulation, and dizziness when changing positions.  The decedent was also hypotensive during transport.  At the hospital, the decedent was seen and evaluated by Collins.  The results of the decedent's blood work showed that his white blood cell count and neutrophils were elevated, while his lymphocytes were low.  During the evaluation, Collins noted a high respiratory rate, mild left shoulder pain and distress, and limited range of motion in the decedent's left shoulder.  After administering intravenous (IV) fluids, morphine sulfate for pain, and acetaminophen, Collins determined that the decedent's condition had improved and did not require his medical admission.
            At 4:50 A.M. on August 5, Collins discharged the decedent and advised him to follow up with an orthopedic evaluation.  Although Dr. Peter Bosco was the attending physician during this visit, Bosco did not examine or treat the decedent.
            On the following day, August 6, the plaintiff had difficulty waking the decedent, who appeared to be suffering from an altered mental state.  At 2:08 P.M., he returned to the CCH emergency department via ambulance.  During transport, the decedent was confused; began talking to himself; and was unaware of the date, his location, his birthday, or his weight.  At the hospital, the decedent's blood work yielded various abnormal findings, and a computed tomography (CT) scan of his left shoulder was completed.  By 8 P.M., the decedent was diagnosed with sepsis.  He was also diagnosed with infectious encephalopathy and admitted to the intensive care unit.
            At the recommendation of an orthopedic physician, a left shoulder ultrasound was completed on August 7, revealing a large shoulder joint effusion.  Following an aspiration and drainage from the left shoulder joint in the operating room, the decedent was diagnosed with left shoulder septic arthritis.
            Postoperatively, although the decedent continued to be administered various antibiotics, his condition worsened.  Eventually, at 7:57 A.M. on August 8, the decedent suffered cardiac arrest and died.  The causes of death noted on his death certificate were septic shock, acute septic arthritis of the left shoulder, metabolic acidosis, and acute-on-chronic renal failure.
            2.  Procedural history.  In July 2023, the plaintiff commenced a medical malpractice action in the Superior Court against Collins, Herbst, Hixon, Liska, Bosco, Willis, and Cape Cod Orthopedics.  In her fifty-six count complaint, the plaintiff asserted eight claims against Collins, including counts for wrongful death, conscious pain and suffering, breach of express and implied warranties, and lack of informed consent.
            In September 2023, the plaintiff filed an offer of proof, which included the decedent's applicable medical records from the CCH emergency department, his primary care physician, and Cape Cod Orthopedics; the decedent's death certificate; and two signed letters and curriculum vitae from expert physicians.  In the letter pertaining to Collins, Dr. Mark Richman, a board-certified emergency and internal medicine physician, opined that Collins's care and treatment of the decedent fell below the accepted standard of care for a qualified nurse practitioner, specifically citing Collins's failure to, inter alia, recognize symptoms of possible septic arthritis or order additional imaging studies.  He further opined that as a result of Collins's deviations from the accepted standard of care, the decedent suffered a premature and preventable death.
            Later that month, after filing an answer to the plaintiff's complaint, Collins filed a rule 73 demand for a medical malpractice tribunal.  In his demand, Collins challenged Richman's opinions regarding Collins's alleged deviations from the standard of care and the causes of the decedent's harm.  Except for Herbst, all other defendants also filed demands for a medical malpractice tribunal.
            A medical malpractice tribunal convened on January 5, 2024, to evaluate the evidence in the plaintiff's offer of proof in accordance with § 60B.  After a hearing, the tribunal found that the plaintiff's evidence failed to raise a legitimate question of liability appropriate for judicial inquiry as to Collins, but did raise a legitimate question of liability as to Liska, Bosco, and Hixon.  A second tribunal found the evidence insufficient to raise a legitimate question of liability appropriate for judicial inquiry as to Willis and Cape Cod Orthopedics.
            The plaintiff, claiming indigency, subsequently filed an emergency motion to reduce the bond required by § 60B, which was denied.  After the plaintiff failed to post the requisite bond within thirty days of the tribunal finding, Collins moved to dismiss the plaintiff's claims against him and for separate and final judgment pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974).  A Superior Court judge allowed Collins's motion and entered separate and final judgment in his favor.  The plaintiff appealed, and we transferred the case from the Appeals Court on our own initiative.
            Discussion.  At issue on appeal is whether the medical malpractice tribunal erred in its ruling that the plaintiff failed to raise a legitimate question of Collins's liability.[4]  We hold that the decision of the tribunal was erroneous and accordingly vacate the judgment of dismissal.
            1.  Framework for medical malpractice tribunals.  General Laws c. 231, § 60B, provides in part:
"Every action for malpractice, error or mistake against a provider of health care shall be heard by a tribunal consisting of a single justice of the superior court, a physician licensed to practice medicine in the commonwealth . . . and an attorney authorized to practice law in the commonwealth, at which hearing the plaintiff shall present an offer of proof and said tribunal shall determine if the evidence presented if properly substantiated is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result."
Where the tribunal finds for a defendant, a plaintiff's claim against the defendant will be dismissed unless the plaintiff posts a $6,000 bond,5 payable to the defendant for costs assessed if the plaintiff does not prevail in the final judgment, within thirty days of the tribunal's finding.  G. L. c. 231, § 60B.  The Legislature enacted the tribunal screening procedure and the bond requirement to "discourage frivolous medical malpractice claims" (citation omitted).  Polanco v. Sandor, 480 Mass. 1010, 1011 (2018).  The tribunal discourages frivolous claims by "reviewing 'the medical aspects of the claim for the purpose of distinguishing between cases of tortious malpractice and those involving merely an unfortunate medical result'" (quotation omitted).  Vasa v. Compass Med., P.C., 456 Mass. 175, 178 (2010), quoting Salem Orthopedic Surgeons, Inc. v. Quinn, 377 Mass. 514, 521 (1979).
            A plaintiff shall prevail before a medical malpractice tribunal if his or her offer of proof presents sufficient evidence that (1) the defendant is a health care provider as defined in § 60B, see Santos v. Kim, 429 Mass. 130, 133 (1999); (2) the defendant's "performance did not conform to good medical practice," Kapp v. Ballantine, 380 Mass. 186, 193 (1980); and (3) "damage resulted therefrom," id.  We have previously held that the evidence presented by an offer of proof should be viewed by a standard comparable to a motion for a directed verdict, which requires the evidence to be viewed in the light most favorable to the plaintiff.  Blake, 412 Mass. at 484.  Notably, "the offer of proof before the tribunal is made without the benefit of discovery and at the earliest stage in the life of the litigation."  Feliciano, 95 Mass. App. Ct. at 38.  Therefore, the tribunal has a "narrow" task of "examin[ing] the evidence proposed to be offered on behalf of the patient to determine whether that evidence, if properly substantiated, 'is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result'" (quotations and citation omitted).  Id. at. 37-38, quoting G. L. c. 231, § 60B.
            Under this standard, "[a]ny factual dispute as to the 'meaning' of the record [before the tribunal] is for the jury."  Kopycinski v. Aserkoff, 410 Mass. 410, 418 (1991).  In resolving this factual determination, "the tribunal may not examine the weight and credibility of the evidence."  Perez v. Bay State Ambulance & Hosp. Rental Serv., Inc., 413 Mass. 670, 676 (1992).  Still, even with these restrictions and while viewing the offer of proof in the light most favorable to the plaintiff, the offer of proof must contain "more than mere conclusory allegations" to pass muster under § 60B, Booth v. Silva, 36 Mass. App. Ct. 16, 20 (1994), and an expert opinion submitted as part of a plaintiff's offer of proof must be "rooted in the evidence" rather than based on assumptions unsupported by the record, Cooper v. Cooper-Ciccarelli, 77 Mass. App. Ct. 86, 93 (2010).
            2.  Application.  As discussed, the plaintiff's offer of proof needed to present sufficient evidence that (1) Collins was a health care provider, (2) Collins failed to conform to good medical practice, and (3) Collins's failure caused harm to the decedent.  It is undisputed that Collins was a health care provider as defined in § 60B.  We deal, therefore, only with the remaining two questions -- i.e., whether Collins failed to conform to good medical practice and, if so, whether there was a sufficient nexus between that alleged failure and the harm suffered by the decedent.
            a.  Failure to conform to good medical practice.  Collins's alleged failures to conform to good medical practice are detailed in Richman's letter that was submitted as part of the plaintiff's offer of proof.  In his letter, Richman summarized the facts pertaining to Collins's medical care based on his review of the pertinent medical records and the decedent's death certificate; stated his familiarity with the accepted standards of care in Massachusetts for the average qualified emergency medicine nurse practitioner and for the diagnosis and treatment of septic arthritis in patients presenting to an emergency department; detailed the standard of care as it pertained to a patient presenting to the emergency department in circumstances similar to those of the decedent; and explained how, in his opinion, Collins deviated from that standard of care.  Specifically, Richman opined that Collins
"1) failed to recognize and appreciate signs and symptoms of possible septic arthritis[;] 2) failed to order additional imaging studies, including, but not limited to[,] CT, MRI and/or ultrasound, for further evaluation[;] 3) failed to order and administer broad spectrum IV antibiotics to treat [the decedent's] cellulitis of the left hand[;] 4) failed to order bloodwork in addition to a [complete blood count], including, but not limited to[,] an [erythrocyte sedimentation rate] and [C-reactive protein], to assess for inflammation[;] [5]) failed to recognize and treat for septic shock[;] . . . and [6]) failed to admit [the decedent] for further work-up and treatment, including but not limited to joint drainage, [and] IV broad spectrum antibiotics for at least one week, and [instead] discharge[d] [the decedent] on [oral] antibiotics."
            In his rule 73 demand, Collins contended that Richman's opinions regarding his alleged deviations from the standard of care were "not rooted in the evidence and overlook[ed] significant clinical facts."  Collins argued that Richman "completely ignore[d]" the nature of the pain reported by the decedent, who did not convey the kind of "severe" or "sharp, aching" pain associated with septic arthritis or septic shock but instead reported to Collins that he experienced increased shoulder pain after a chiropractic manipulation from the previous day.  Thus, Collins maintained that "it was reasonable for [him] to attribute the worsening of [the decedent's] left shoulder pain to his chiropractic manipulation" rather than septic arthritis.
            Collins's argument is unconvincing.  Even to the extent that Richman failed to address contrary evidence -- such as the lack of any reportedly severe pain -- "[t]he weight to be accorded [an expert's] opinion in relation to contrary evidence belongs at a later stage of proceedings" (citation omitted).  Booth, 36 Mass. App. Ct. at 24.  See Feliciano, 95 Mass. App. Ct. at 38-39.  That is, Collins's contention that Richman may have overlooked certain facts goes to the weight and credibility of his opinion, which is beyond the purview of the tribunal.  See Keppler v. Tufts, 38 Mass. App. Ct. 587, 589 (1995).
            Further, we note that "a factually based statement by a qualified expert, without more, is sufficient to meet the tribunal standard" (citation omitted).  Feliciano, 95 Mass. App. Ct. at 39.  Richman's opinion was rooted in evidence, namely, the decedent's medical records.  For example, records from CCH's emergency department show the decedent's then-recent history of cellulitis and streaking lymphangitis, which -- according to Richman -- are indicative of an increased risk of septic arthritis.  Given this increased risk, as well as the decedent's "complaints of worsening left shoulder pain, pain and tenderness in the left shoulder, . . . inability/difficulty using the arm, marked hyperglycemia, and hypotension," Richman opined that the care and treatment rendered by Collins fell below the accepted standard of care for the average qualified nurse practitioner.  Moreover, Richman did not make "mere conclusory allegations."  Booth, 36 Mass. App. Ct. at 20.  Instead, he "focused on an asserted negligent failure to treat specific symptoms known to [Collins] on specific days."  Mataitis v. St. Goar, 416 Mass. 325, 327 (1993).  According to Richman, Collins failed to promptly order additional imaging studies and blood work, administer certain antibiotics, admit the decedent for further treatment, and recognize the symptoms of septic arthritis or septic shock.  These failures, he maintained, fell outside the accepted standard of care of a qualified nurse practitioner treating an emergency department patient in the decedent's condition.  Richman's expert opinion, rooted in the evidence, was sufficient to meet the tribunal standard.
            b.  Causation.  We now turn to the question of causation.  To satisfy the causation element before a medical malpractice tribunal, a plaintiff has the burden to present sufficient evidence that, if properly substantiated, raises a legitimate question that the defendant "more probably than not" caused the alleged harm.  Bradford v. Baystate Med. Ctr., 415 Mass. 202, 209 (1993).  A plaintiff's offer of proof must present evidence beyond conjecture or speculation that a causal link exists between the medical provider's alleged negligence and the patient's harm.  See Keppler, 38 Mass. App. Ct. at 592.  An expert's testimony that a causal link "is possible, conceivable or reasonable, without more, is not enough."  Berardi v. Menicks, 340 Mass. 396, 402 (1960).  However, "the testimony of an expert that such relation exists or probably exists is sufficient."  Id.
            Here, Richman opined in his letter as follows:
"As a direct result of . . . Collins'[s] deviations from the accepted standard of care, [the decedent] suffered a premature and preventable death.  Had . . . Collins provided care within the accepted standard of care[,] . . . [the decedent's] left shoulder septic arthritis would have been diagnosed and treated earlier in time when it was amenable to cure and, more likely than not, he would not have suffered deterioration from septic shock and metabolic acidosis that resulted in his premature and preventable death on 8/8/20."
            As he did in his rule 73 demand, Collins contends on appeal that Richman's opinions on causation are conclusory and speculative.  More specifically, Collins argues that Richman failed to explain how, if Collins had engaged in the allegedly proper course of conduct when seeing the decedent on August 4, the decedent's "work-up and treatment course would have been different from the actual treatment [he received] when he returned to the hospital" approximately two days later.  And even if this had led to a different course of action, Collins claims it is speculative that such a different course would have led to a better result -- namely, an earlier diagnosis of the decedent's septic arthritis that in turn would have allowed for a successful treatment.6  After all, Collins contends, the decedent was not immediately diagnosed with septic arthritis when he was readmitted to the hospital on August 6.
            Collins's first point regarding a hypothetically different course of treatment misses the mark.  Richman did not contend that the treatment the decedent received on August 6 was insufficient, and therefore that a qualitatively different course of treatment was needed; rather, he opined that, by that time, the decedent's septic arthritis was no longer amenable to cure.  In Richman's opinion, credited at this stage as it must be, had Collins conformed to good medical practice when he saw the decedent on August 4, the decedent, more probably than not, would not have suffered deterioration from septic shock that resulted in his premature death.  See Bradford, 415 Mass. at 209.
            More importantly, Collins overlooks the fact that the providers who treated the decedent on August 6 performed additional imaging and blood work that Collins had failed to order.  Given the nearly two-day gap between when Collins attended to the decedent and when doctors performed further imaging and blood work, the conclusion that the decedent's septic arthritis would have been diagnosed and treated sooner -- when it was still "amenable to cure" -- had Collins conformed to the standard of care is not speculative if Richman's opinion is properly credited, as it must be at this stage.  Whether or not the nearly two-day gap actually would have made a difference, and at what point the decedent was truly "amenable to cure," are questions that must be resolved at a later proceeding.  See Booth, 36 Mass. App. Ct. at 24.
            What's more, it is difficult to reconcile the medical malpractice tribunal's finding of sufficient evidence as to Bosco, the attending physician when the decedent was seen by Collins.  As mentioned, there is no evidence in the record that Bosco treated the decedent.  Yet the plaintiff's offer of proof lays out identical arguments regarding a failure to conform to good medical practice and causation for both Collins and Bosco.[7]
            In sum, the plaintiff's offer of proof provides more than conclusory and speculative statements and, when viewing the evidence in the light most favorable to the plaintiff, adequately shows a causal relationship between Collins's negligence and the decedent's harm.  See Nickerson v. Lee, 42 Mass. App. Ct. 106, 112 (1997).  The tribunal's apparent conclusion to the contrary is unsupported.
            Conclusion.  Because the evidence presented in the plaintiff's offer of proof, if properly substantiated, was sufficient to raise a legitimate question of liability appropriate for judicial inquiry, the judgment of dismissal as to Collins is vacated, and the plaintiff may proceed with her claims against him without posting a bond.
So ordered.
 
footnotes

 
            [1] Of the estate of Ronald Bennett.
            [2] While the plaintiff's complaint alleges malpractice on the part of several medical providers, she appeals only from the entry of separate and final judgment in favor of nurse practitioner Michael Collins.
            [3] The decedent's shoulder and humerus had been X-rayed on July 6.
            [4] The plaintiff asks us to resolve a number of other issues that she acknowledges are not necessary to the ultimate outcome of this case.  We decline her invitation to do so.
            [5] As a matter of discretion, the amount of the bond may be increased or, upon a determination that the plaintiff is indigent, decreased.  See G. L. c. 231, § 60B.
            [6] Collins also emphasizes Richman's use of the word "possible" in his opinion that Collins failed to recognize symptoms of "possible septic arthritis."  However, Richman never suggests that Collins's negligence was only a "possible" cause of the decedent's death.  Rather, Richman uses the word "possible" in his explanation that the standard of care required Collins to "recognize and appreciate signs and symptoms of possible septic arthritis."  Richman's use of the word "possible" here reflects his belief that Collins should have recognized this "possible" case of septic arthritis, which more probably than not would have been confirmed had Collins acted in conformity with good medical practice.
            [7] Although Collins is a nurse practitioner and Bosco is a physician, Richman opined that the standard of care compelled both of them to take virtually identical actions with regard to evaluation and treatment of the decedent.